807 A.2d 651

**Gail L. YOUNG**

v.

**ANNE ARUNDEL COUNTY, Maryland.**

No. 2128, Sept. Term, 2000.

Court of Special Appeals of Maryland.

Sept. 11, 2002.

528

**530**

532

534

Ronald H. Jarashow (Franch, Jarashow, Burgmeier & Smith, P.A., on the brief), Annapolis, for appellant.

William D. Evans, Jr., Senior Assistant County Attorney (Linda M. Schuett, County Attorney, on the brief), Annapolis, for appellee.

HOLLANDER, KRAUSER and JAMES S. GETTY, (Retired, Specially Assigned), JJ.

HOLLANDER, J.

In this appeal, we have been asked to decide whether Gail Young, appellant, the widow of Charles Young, Jr. (the "Decedent" or "Young"), is entitled to recover survivor pension benefits from Anne Arundel County (the "County"), appellee, under the County's Police Service Retirement Plan (the "Plan"). Young retired as a County police officer in September 1992, and was diagnosed with dementia in 1995, at the age of fifty-three. At the time of Young's death on October 19, 1997, he was survived by a minor child, Theresa Young;[1] a sister, Susan Grier; and his wife, from whom he had separated.

Pursuant to a marital separation agreement (the "Separation Agreement" or "Agreement"), executed by appellant and Young in September 1996, the Youngs waived their respective rights to the other's retirement funds. In March 1997, the Decedent also executed a change of beneficiary form, naming his sister as the beneficiary under the Plan. The circumstances that led to the execution of the Separation Agreement and the change of beneficiary form are in dispute. Nevertheless, based on the Agreement, the County's Office of Personnel refused to award Young's pension benefits to appellant. Aggrieved by that determination, appellant filed a claim with the Anne Arundel County Board of Appeals (the "Board"). At a hearing on May 26, 1998, the Board refused to address

---

1. From what we can determine, appellant is not the mother of Theresa Young.

appellant's challenges to the validity of the Agreement and change of beneficiary form, and denied her request for pension benefits.

Appellant then sought judicial review of the Board's decision in the Circuit Court for Anne Arundel County. On September 1, 1998, while the judicial review petition was pending, appellant filed a Complaint for Declaratory Judgment. The circuit court stayed the declaratory action and remanded the matter to the Board for further consideration of appellant's claims. Thereafter, the Board held an evidentiary hearing on May 27, 1999, but declined to consider the validity of the Agreement or change of beneficiary form. Presuming those documents to be valid, the Board rejected appellant's request for benefits.

The circuit court subsequently consolidated the declaratory action and appellant's second administrative review petition. The parties then filed cross-motions for summary judgment. Following a hearing, the court concluded, *inter alia,* that appellant waived any claim to Young's pension benefits when she executed the Separation Agreement. Accordingly, the court granted the County's summary judgment motion and denied appellant's motion.

On appeal, Ms. Young presents several issues for our consideration, which we have rephrased and reordered:

I. Whether appellant's status as the spouse of a retired, deceased police officer entitled her to the survivor benefits under the Plan.

II. Whether appellant could lawfully waive her rights to benefits under the Plan, pursuant to the marital separation agreement executed by appellant and Charles Young.

III. Was the waiver language in the separation agreement sufficient to constitute a waiver of benefits?

IV. Was the filing with Aetna of the Change in Beneficiary Form effective, as a matter of law, to deprive appellant of benefits under the Plan, despite her status as the spouse and joint annuitant of Charles Young?

V. Did the court err in granting summary judgment to
 the County as to the claims of duress and incapacity,
 because the validity and enforceability of the marital
 separation agreement presented disputes of material
 fact?

For the reasons that follow, we shall vacate the award of
summary judgment and remand this case to the circuit court
for further proceedings.

## FACTUAL SUMMARY

Young was born on February 22, 1942, and began his
service with the County in 1970. Appellant, who was born on
May 19, 1946, married Young on February 15, 1992. On July
15, 1992, in anticipation of his impending retirement from the
County police on September 1, 1992, Young executed the
"ANNE ARUNDEL COUNTY RETIREMENT INCEN-
TIVE PROGRAM PARTICIPATION AGREEMENT."
From the time of his retirement until his death in October
1997, Young was married to appellant.

Aetna Life Insurance Company ("Aetna") has served as the
third-party administrator of the County's Police Service Re-
tirement Plan since July 1, 1969, pursuant to a "GROUP
ANNUITY CONTRACT" (the "Contract") with the County.
In that capacity, Aetna makes annuity and other payments of
pension benefits to the beneficiaries of the Plan. Pursuant to
the Plan, codified in Anne Arundel County Code ("A.A.C.C."),
Art. 7, Title 5, § 5–102, Young received two annuity payments
per month under the Plan. One payment was in the amount of
$1835.00, and the other was in the amount of $263.52.

According to the County, Aetna was its authorized agent
with respect to the Plan. Section 11 of the Contract concerns
"Termination and Death Benefits," and § 11G pertains to
Beneficiaries. It states, in relevant part:

11G *Beneficiaries*

11G–1 A Member may name a beneficiary to receive any
Death Benefit which may become due on or after his

death.... Any named beneficiary may be changed by the Member from time to time....

11G–2.... A Retired Member may name or change his beneficiary by written request filed at the Home Office of Aetna. A request filed with the Contractholder shall be forwarded by the Contractholder to Aetna, in accordance with Aetna's established administrative procedures, at least one month before the Member becomes a Retired Member or, if he dies before becoming a Retired Member, promptly after his death.

11G–3 A request to name or change a beneficiary will be effective on the date it is signed by a Member, whether or not the Member is living when the request is receiver by Aetna at its Home Office, but without prejudice to Aetna because of any payments made by Aetna before receipt of the request at its Home Office.

11G–4 Aetna will make a Death Benefit payment to the appropriate payee listed below if, on the date the Death Benefit payment is due, no beneficiary has been duly named by the member or no named beneficiary is alive. The payees are as follows:

(a) the surviving spouse of the member, if any....

On or about July 13, 1992, Young executed an Aetna form titled "ELECTION AND INFORMATION FORM," in which he selected the "JOINT ANNUITY OPTION" in Section D, naming Gail Young as his wife and "Joint Annuitant." That portion of the form provided:

With 100% of the annuity payable to be continued to my Joint Annuitant upon my death.

| I designate my Joint Annuitant | Gail Young | Wife |
|---|---|---|
| | (Name) | (Relationship) |

Under § G, Young also elected payment of his benefits to begin on September 1, 1992. That portion of the form contains a space for the "Designation of Beneficiary," but no name is inserted in the line provided.

On the same date, Young also completed an Aetna form entitled "DESIGNATION/CHANGE OF BENEFICIARY,"

which was filed with the County's Personnel Office. Under "MARITAL STATUS," Young wrote "MARRIED." In this form, Young designated appellant as the sole primary beneficiary of the Plan, and he named his daughter as the sole secondary beneficiary. The document states, in relevant part:

> **CONDITIONS**—Unless otherwise expressly provided on this Designation/Change of Beneficiary form, any sum becoming payable upon my death under my employer's plan will be payable as prescribed in such plan. *After payment of any amount required by the plan to be paid to my spouse, any remaining benefit will be paid to:*
>
> a. My designated primary beneficiary or beneficiaries if they should survive me;
>
> b. My designated secondary beneficiary or beneficiaries if no designated primary beneficiary or beneficiaries survive me.
>
> \* \* \*
>
> *If my marital status changes, the validity of this designation may be affected. In the event of such a change, I should complete a new Designation Change of Beneficiary form.*
>
> **DESIGNATION REQUEST**—Subject to the terms of my employer's plan, I request that any sum becoming due upon my death be payable to the beneficiary(ies) designated below. I understand this designation shall revoke all prior beneficiary designations made by me under my employer's plan.

(Emphasis added).

Young and appellant each signed the document, certifying that "this Designation of Beneficiary is subject to all the CONDITIONS stated above." Under their signatures, the following appears: "To the best of my knowledge, the marital status of the participant/designator is as shown above." The signature of Mr. Valle, a County Personnel Office employee, appears in the space provided for the "SIGNATURE OF PLAN REPRESENTATIVE."

The designations of appellant as spouse, beneficiary, and joint annuitant were the only designations filed with the County's Personnel Office. No change was ever made in the records of the Personnel Office with regard to those designations.

As we noted, Young was diagnosed with dementia in 1995, at 53 years of age. At about the same time, appellant's stepfather died and her mother, who lived in Virginia, suffered a severe stroke, which resulted in significant paralysis. As a result of appellant's financial circumstances, she had to work outside the home while trying to care for both her mother and husband. Because of her difficulties, appellant sought help in February 1996 from Young's sister and brother-in-law, Susan and Robert Grier, who lived in upstate New York.

According to appellant, in March 1996 Young began to reside with the Griers, because they were in a position to provide him with the full-time care that he needed. Nevertheless, appellant claims that she maintained regular contact with Young until May 1996, when the Griers allegedly denied her visitation. Appellant asserts that in June 1996 the Griers asked her to consent to their appointment as guardians of the person and property of Young. According to appellant, when she refused to consent, the Griers retaliated by refusing "scheduled visits" with her husband, including a visit planned for June 28, 1996.

Appellant claims that, on or about July 8, 1996, the Griers contacted her regarding Young's need for "constant supervision and medical care," and they suggested that she sign a marital separation agreement. Then, in August 1996, appellant received the Agreement in the mail, which had been prepared by the Griers' attorney. According to appellant, the "Griers represented to Gail Young that unless she signed the [A]greement, they would never permit her to see Charles Young again." Young reportedly signed the Agreement before a notary public on September 9, 1996, and appellant executed it on September 20, 1996.

The Agreement states, in relevant part:

1. It shall be lawful for the Wife at all times hereafter to live separate and apart from the Husband, and free from his marital control and authority as if she were sole and unmarried and free from any control, restraint, or interference, direct or indirect, by the Husband; and it shall be lawful for the Husband at all times hereafter to live separate and apart from the Wife, and free from her marital control and authority as if he were sole and unmarried and free from any control, restraint, or interference, direct or indirect, by the Wife.

\* \* \*

13. The Husband is the owner of a certain joint and survivor annuity which was available to him through his former employer, Anne Arundel County, Maryland. Currently this annuity is handled by Aetna Life Insurance Company under certificate # 164340273. *The Wife* specifically acknowledges that she is aware of this account, is familiar with benefits associated therewith and *waives any interest of any nature thereunder in that account or any successor accounts thereto. The Wife further agrees that the Husband may name any beneficiary to any death benefits associated with this plan.*

13a. The Wife has an interest in two retirement plans from previous employers. They are a 401–K Plan with Blue Cross/Blue Shield which has been rolled over into an Individual Retirement Account # 226–60–6287 with Investors Fiduciary Trust Co., and a Vested Life Annuity through Blue Cross of Maryland's Inc. retirement program. The Husband specifically acknowledges that he is aware of these accounts, is familiar with the benefits associated therewith, and waives any interest of any nature thereunder in those accounts or any successor accounts thereto. The Husband further agrees that the Wife may name any beneficiary to any death benefit associated with either of these plans.

\* \* \*

16. The provisions of this agreement shall not prevent either party from suing for a divorce in any jurisdiction

either within or without the United States upon such grounds that he or she may elect or be advised, but the parties shall nevertheless be bound by all of the terms hereof, and this agreement shall survive a divorce or annulment decree that may be obtained by either party, against the other.

Soon afterwards, beginning September 28, 1996, Young visited with appellant in Maryland, and remained with her until October 12, 1996. During the visit, appellant observed that Young was "in a vegetative state" and his "mental condition had deteriorated significantly." She claims that her husband lacked the ability to communicate, and could not remember significant family dates or names. Upon Young's return to New York, appellant claims that the Griers cut off all further communication with her; she never saw her husband again.

On March 18, 1997, Young executed a "DESIGNATION/CHANGE OF BENEFICIARY" form, designating his sister, Susan Grier, as primary beneficiary, and her husband, Robert Grier, as secondary beneficiary. Under "MARITAL STATUS" he wrote "MARRIED–SEPARATED." Young's signature differed markedly from the signature on his original "DESIGNATION/CHANGE OF BENEFICIARY" form, executed about five years earlier. The bottom of the document contains the following pre-printed statement:

> I certify that I agree to the designation by my spouse of a beneficiary other than myself. I understand that, if I have not been named a beneficiary, I will not be entitled to any death benefit payable under the plan; further, that if I have been named a beneficiary, but not the sole beneficiary, I will not be entitled to the entire death benefit payable under the plan.

The form also contains a signature line, under the heading of "SIGNATURE OF SPOUSE." Appellant never signed the form, however. The "SIGNATURE OF PLAN REPRESENTATIVE" was also left blank. Aetna apparently received this form on April 8, 1997, but the document was not filed with the

County's Personnel Officer prior to Young's death. Instead, it was filed directly with Aetna.

In April 1997, a few weeks after Young executed the change of beneficiary form, he was institutionalized. He remained there until his death on October 19, 1997.

After Young's death, appellant contacted the County Personnel Office regarding her benefits under the Plan. *See* A.A.C.C. § 5–104. By letter dated November 3, 1997, Dennis Buckley, a Personnel Analyst with the County Personnel Office, responded to appellant's inquiry, stating:

We are sorry to hear of the death of your husband, Charles. As Mr. Young's Joint Annuitant, you are entitled to certain benefits from Anne Arundel County.

RETIREMENT—As a member of the Police Retirement Plan, the normal form of retirement for a police officer married at the time of retirement is a 100% Joint and Survivor Annuity Payment Option. As M r. Young's named joint annuitant you are entitled to receive a monthly benefit, commencing November 1, 1997, of $2,383,81, less any authorized deductions. This benefit will continue for your lifetime, unless you remarry.

Thereafter, the County received a letter from the Griers' attorney, advising that appellant had signed the Agreement, in which she waived her rights to any benefits under the Plan. The Griers' attorney also provided the County with a copy of the Agreement. In addition, the County received from Aetna the change of beneficiary form executed by Young in March 1997.

Accordingly, by letter dated December 29, 1997, E. Hilton Wade, a County Personnel Officer, advised appellant that the County had rescinded its decision as to benefits payable to appellant under the Plan. The letter stated, in relevant part:

We received a copy of a separation agreement, dated September 9, 1996 which states in part that you were aware of Mr. Young's pension and the associated benefits and that you waived any interest, of any nature, in the pension. It

goes on to state that Mr. Young could "name any beneficiary to any death benefits associated with the plan."

\* \* \*

You executed the separation agreement before a notary public on September 20, 1996.

On March 18, 1997, Mr. Young executed and forwarded a DESIGNATION/CHANGE OF BENEFICIARY form to AETNA Life Insurance Company.

April 8, 1997, AETNA received this form. However, copies of the beneficiary form and the executed separation agreement were not forwarded to our office for inclusion in Mr. Young's retiree file. ·

Upon Mr. Young's death, you contacted our office inquiring about the benefits available as Mr. Young's spouse. Our office notified you by letter dated November 3, 1997, of what we believed were your entitlements based on the information contained in Mr. Young's file.

As the Plan Administrator and based on the available information, it is my opinion that you entered a valid and enforceable waiver in which you released all claims to any benefits under the plan and that the primary beneficiary designated on the beneficiary form dated March 18, 1997 is entitled to receive any death benefits associated with the plan.

Ms. Young subsequently appealed that decision to the Board, which held a hearing on May 26, 1998.[2] The Board was of the view that it had no jurisdiction to determine the validity of the Agreement or the competency of the Decedent. Therefore, it stayed the matter, "pending the resolution of matters the Board deemed outside its jurisdiction." Subsequently, appellant sought judicial review in the circuit court.

---

2. The County also denied benefits to Ms. Grier. She appealed to the Board, but her appeal was denied in August 1998 as untimely. Ms. Grier did not challenge that ruling.

Additionally, she filed a multi-count Complaint for Declaratory Judgment on September 1, 1998.[3]

On February 12, 1999, the circuit court issued a remand and ordered the Board to "lift its stay of administrative proceedings ... and 'decide whatever issues it deems are within its jurisdiction.'" The court also stayed the declaratory action pending a decision of the Board.

The Board held an evidentiary hearing on May 27, 1999. Nevertheless, the Board again confined its review to the "four corners of the Anne Arundel County Police Service Retirement Plan," and declined to consider the matters that it considered as beyond its jurisdiction. At the outset of that hearing, the Board chairman said, in part:

---

3. The declaratory action contains the following counts and captions:

Count I—Plaintiff's Alleged Waiver Of Her Rights Under the Police Service Retirement Plan, Relied Upon By Anne Arundel County To Deny Her Benefits, Is Ineffective Because It Is Not Expressly Authorized By The Plan;

Count II—Defendant's Alleged Waiver Of Benefits, Relied Upon By Anne Arundel County To Deny Benefits Under The Police Service Retirement Plan, Is Ineffective Because The Language Of Waiver Does Not Sufficiently Identify The Subject Matter Of The Waiver With Sufficiently Specific Or Express Language;

Count III—The Alleged Change Of Beneficiary Form Executed By Charles E. Young, Jr. Shortly Before His Death Is Ineffective Due To A Failure To Comply With The Requirements Of The Anne Arundel County Code;

Count IV—The Alleged Change Of Beneficiary Form Executed By Charles E. Young, Jr. Shortly Before His Death is Ineffective For Its Failure To Contain Plaintiff's Acknowledgment Of Certain Disclosures And Her Knowledge Of Her Rights Under The Police Service Retirement Plan;

Count V—The Marital Separation Agreement, Relied Upon By Anne Arundel County To Deny Plaintiff Her Spousal Death Benefits, Is Void For Lack Of Sufficient Mental Capacity Of Charles E. Young, Jr. At The Time Of Its Execution;

Count VI—The Change Of Beneficiary Form, Relied Upon By Anne Arundel County To Deny Plaintiff Her Spousal Death Benefits, Is Void For Lack Of Sufficient Mental Capacity Of Charles E. Young, Jr. At The Time of Its Execution;

Count VII—Anne Arundel County Must Pay Spousal Death Benefits To Plaintiff Pursuant To Its Contract With Charles E. Young, Jr. Regardless Of Any Ancillary or Subsequent Agreements To The Contrary.

I'm going to state right from the very beginning we believe now as we did then that *we do not have any jurisdiction to determine whether this was a legal separation agreement. So that's issue number one, that we're not going to take any verbal testimony.*

Issue number two ... *we're not of the jurisdiction to determine whether there's any mental competency was of Mr. Young* [sic] at the time any of this transpired with regards to his pension. . . .

We will, however, because we feel those issues must be answered in the court allow both parties, if they wish to do so, to protect the record, to put in the documentations. For instance, the Separation Agreement can be part of the record, also any documentation that the petitioner may have as to the mental competency of Mr. Young at the time. That can be part of the record and documentation.

We certainly have no jurisdiction to determine about what impact they would have on this ... case and unfortunately *those issues must be resolved.* We will do the best we can absent any verbal testimony in these areas to make a finding that would satisfy the court once they resolve these issues to determine what should happen with the pension.

(Emphasis added).

In his opening statement, appellant's attorney told the Board that Ms. Grier, the Decedent's sister, "had her eye" on the benefits under the Plan, and sought to deprive appellant of "her rights" under the Plan. Characterizing the case as "complex," appellant's counsel explained that Ms. Young challenged the County's construction of the Agreement, and was appealing the determination that she had waived her rights to benefits. But, her lawyer asserted that their "hands are very limited" as to "what [they] can get into" to respond to what the County had "placed ... in issue." In outlining the issues, Ms. Young's lawyer said:

Was this properly filed with the [C]ounty? That's an issue in this case. . . . Was this Change of Beneficiary form signed by my client, Gail Young, as the document itself purports to

require? Did the—was the [C]ounty within its rights and did it properly review this outside document, this Separation Agreement in determining whether or not benefits should be awarded here?

Another issue is if the [C]ounty was within its rights to review this document, is this a valid waiver by my client? In other words is it knowing and intelligent? Did she know what the benefits were that she was waiving?

And finally we have this issue of—of Mr. Young's competency when he signed these documents—these two documents. So these are all major issues—issues that we'll not be reaching tonight pursuant to your direction, but issues nonetheless if this document was—was appropriately considered by the Board—by the personnel office in making their decision. If not, our job becomes much more simple because we are then confined to language of the *County Code.*

In his opening, the County's attorney characterized the matter as a "kind of competition for these benefits." According to the County, Ms. Young had waived her rights under the Agreement, and the Decedent lawfully changed the beneficiary forms. As the County's lawyer explained, after consulting with the County Office of Law, the County determined there was an "effective waiver of any benefits . . ." under the Plan.

Dennis Buckley, a Personnel Analyst with the County Office of Personnel, testified at the hearing. He explained that, upon the death of a Plan participant, an eligible spouse is entitled to the continued receipt of the police officer's retirement benefits for the balance of the surviving spouse's life, or until the spouse re-marries. In contrast, if a participant dies within five years of retirement, without an eligible spouse, a designated beneficiary is only entitled to continuation of the payments for the period remaining between the date of retirement and a total of five years. In that circumstance, benefits cannot be paid for more than five years.

According to Buckley, the Plan contains a hierarchy of benefit payments upon the death of a retiree. Under A.A.C.C.

§ 5–211(f), benefits are "payable first to an elected contingent annuitant." If there is no elected contingent annuitant, benefits are payable to a spouse; if there is no spouse, they are payable to minor children; if there are no minor children, then benefits are payable to a beneficiary. Buckley testified that the Decedent did not elect a contingent annuitant, and therefore "the first taker of any benefits would be the spouse," in accordance with § 5–211(f).

In his testimony, Buckley said that Aetna functions as the "third party payer" for the Plan, and "[t]hey pay the benefits out." Initially, Buckley determined that appellant should receive death benefits under the Plan, but that decision was later changed, based on an opinion from the County's Office of Law. Buckley explained: "[B]ased on the Separation Agreement that was presented to us ... Mrs. Young had indeed waived her rights to any interest to the pension...."

Buckley recalled that the Personnel Office received from Aetna a change of beneficiary form executed by Young. As a result, the County determined that Ms. Grier was the beneficiary. Pursuant to § 5–211(g), however, no benefits were paid to Ms. Grier, because Young died more than five years after he retired.

Thomas Mullenix, the County's Director of Employee Benefits, testified that the matter of benefits was raised with the County Office of Law and, in the opinion of that office, the Agreement was valid and enforceable. The Personnel Office relied on that opinion in denying benefits to appellant.

In a written decision of August 11, 1999, the Board affirmed the Personnel Office. The Board reiterated that it had "no jurisdiction to determine the enforceability of ... the Separation Agreement," or to determine whether the Decedent was competent when he executed the change of beneficiary form. Therefore, the Board "presum[ed] that both the Separation Agreement and Change of Beneficiary Form [were] valid," and concluded that appellant was not entitled to the benefits. It said:

The Board finds that the Personnel Officer rightfully denied Ms. Young's request for Mr. Young's pension. Participants in the County's pension program may change the designated beneficiary.... Mr. Young filed a change of beneficiary notice on a form provided by Aetna.... The Board finds that this form ... meets the requirement that the form be satisfactory to the Personnel Officer.... The Board also finds that Mr. Young properly filed the form since it was delivered to Aetna. The Code requires that the designation of spouses and beneficiaries be filed with the Personnel Officer. [Anne Arundel County Code (the "Code"), Article 7, Pension Plan, Section 5–210(b) ]. Aetna is the County's agent for purposes of administering the pension program. The correspondence regarding the plan is generated by Aetna. The participants in the plan deal with Aetna. The Board finds that the requirement that the forms be filed with the Personnel Officer is met when a participant files the form with Aetna, as agent of the County.

The most recent designation/change of beneficiary form filed by Mr. Young reflected that the beneficiary of his pension is Susan K. Grier, the sister of Mr. Young. The Separation Agreement states that Mr. Young, "may name any beneficiary to any death benefits associated with" his Aetna annuity. The Board finds that together these items constitute a proper designation of beneficiary by Mr. Young.

The pension plan clearly favors the payment of benefits to the named "beneficiary" over payments to a "spouse." Only if no name has been filed or if the named beneficiary does not survive the participant are the benefits permitted to be paid to others. Section 5–201(b). The benefits that would have been paid to the named beneficiary can then be paid "at the option of the Personnel Officer to either the participant's surviving spouse, the participant's surviving children in equal shares, or the executor or administrator of the participant."

The Board notes, however, that if the Circuit Court determines that Ms. Young did not waive her rights to Mr.

Young's pension in the Separation Agreement and the Change of Beneficiary Form is invalid due to Ms. Young's incompetence then Ms. Young may be entitled to Mr. Young's pension benefits. Unfortunately, this Board has no jurisdiction to decide such matters.[4]

Appellant sought judicial review of the Board's decision. That case was captioned No. C–99–57676–AA. In addition, appellant moved to consolidate the second petition for judicial review with the declaratory action, claiming that the issues were "identical" and included, *inter alia,* whether the County could consider the Agreement; whether Young had sufficient mental capacity when he executed the Agreement and the change in beneficiary form; and whether appellant executed the Agreement "under duress."

On July 6, 2000, appellant filed a motion for summary judgment in the judicial review case, solely "on the basis that the Aetna form could not change the benefits due to Gail Young." She claimed it was the one issue for which the facts were undisputed, and which could be dispositive of the entire case. On August 4, 2000, the County filed a cross-motion for summary judgment "on all issues," as well as an opposition to appellant's motion. It argued that "the filing of the form with Aetna life insurance company constituted substantial compliance with the county code requirements;" the "Code's provision regarding the procedures to change or designate new beneficiaries is directory, rather than being mandatory;" one's "status as a spouse does not automatically make a person a beneficiary" under the Plan; appellant "waived any claim to plan benefits;" and appellant "cannot impeach the separation agreement." In opposition to the County's motion, appellant claimed, *inter alia,* that the Agreement was not "enforceable" because she "was under duress or diminished capacity and was coerced at the time she signed" it.

---

4. The Board Chairman dissented on the grounds that: 1) the filing of the change in beneficiary form with Aetna was improper, because it should have been filed with the Personnel Office; and 2) the form was defective, because it was incomplete on its face, as Ms. Young had not signed it.

The parties submitted various exhibits, including the Separation Agreement and affidavits. In an affidavit of Buckley offered by the County, Buckley averred, in part:

6. Attached as Exhibit "C" are excerpts from the Contract [between the County and Aetna]. Section 11 G–2 provides as follows: "A Retired Member may name or change his beneficiary by a written request filed at the Home Office of Aetna." In other words, the procedure under the Contract for changing a beneficiary designation was to file the necessary form with Aetna, not the Office of Personnel. This procedure has been in place for many years.

Appellant submitted an affidavit of Dr. Jorge Perez–Alard, M.D., an internist. He related that he began to treat Young in early November 1995 for multiple signs of dementia associated with Alzheimer's, a "progressive and degenerative mental illness ... of a permanent and debilitating nature." Young "had difficulty understanding, speaking and processing information necessary for the conduct of daily life," and his condition progressively deteriorated, causing physical and mental health problems, including paralysis. Based on the doctor's expertise and his review of the medical records, he opined, "to a reasonable degree of medical certainty," that, as of September 9, 1996, when Young executed the Separation Agreement, his "capacity to understand a written document such as a contract was so severely limited that he did not have the capacity to understand what was in it or the importance ... of the words." Moreover, the doctor opined that Young's condition would not have improved as of March 18, 1997, when Young executed the change of beneficiary form.

On August 18, 2000, the court signed a "Consent Order To Consolidate Cases." The order provided for the consolidation of the judicial review case and the declaratory action "for all determinations," and directed the parties to use the declaratory action case number (C–98–49102–AA) for all future filings.

At the motions hearing on October 23, 2000, the County acknowledged that, in reaching its decision, the Board had

presumed the validity of the Separation Agreement and the change of beneficiary form. The County maintained, *inter alia*, that by executing the Agreement appellant waived her "statutory right" to the pension benefits. The County also argued that Young was entitled to file the change of beneficiary form either with Aetna or the County. Appellee explained that Aetna "had a long-standing contract with the County for over 20 years. . . . And in that contract, one of their contract duties is to receive and act upon change of beneficiary forms." The County also maintained that "nothing in the Code . . . gives any sort of particular approval process, so there is nothing . . . that says that the wife has to sign" the change in beneficiary form, and it would have been "redundant" for her to do so, in light of the Agreement.

Appellant advanced a host of arguments. She contended that she was qualified for the pension in three ways: as spouse, as beneficiary, and as joint annuitant. She insisted that a spouse can only waive her rights to benefits as part of a divorce, pursuant to a court order. Appellant also asserted that the County's Personnel Office had "no legal authority" to consider either the Agreement or change of beneficiary form because they were not part of the official pension file. As to the change of beneficiary form, appellant claimed that filing the form with Aetna was ineffective, because such forms had to be filed directly with the Personnel Office; it had no authority to delegate that responsibility to Aetna. Rather, Aetna's authority was limited to "how to handle the money in the plan." Moreover, she maintained that the beneficiary form executed in March 1997 did not alter appellant's priority status as the spouse. Further, she asserted that the change of beneficiary form was ineffective because it was incomplete, in that neither Ms. Young nor a County representative signed it. Even if the County could consider the Agreement, she claimed the language of the Agreement was not sufficient to effect a waiver of rights, because it was too general and failed to mention the expectancy or survivorship interests.

Although appellant did not specifically assert in the declaratory action that the Agreement was invalid due to duress, she

made that claim in her opposition to the County's summary judgment motion. There, she expressly claimed the Agreement was not enforceable because it was executed "under duress or diminished capacity and [she] was coerced...." Appellant also argued at the hearing that she "was under duress at the time she signed the Agreement," and that Young lacked the mental capacity to contract.[5] Her lawyer said:

It is our contention that if you find all the other issues against us ... then you have to have a trial on the factual issues of, was there contractual capacity of the parties to enter into a contract at the time the separation agreement was signed, one. And two, even if Chuck Young had contractual capacity at the time, then is Mrs. Young under duress at the time she signed it enough to vitiate her contractual capacity?

Thereafter, in a unitary "Memorandum Of Opinion And Order" of October 26, 2000, the court granted the County's summary judgment motion and denied appellant's summary judgment motion.[6] It also declared that, under ¶ 13 of the Agreement, appellant waived her interest in the Plan, either as an annuitant or a beneficiary.

The court ruled that appellant was entitled to waive her claim to the pension benefits and, as a result of her execution of the Separation Agreement, she validly waived any claim under the Plan. The court also rejected appellant's other claims. In particular, the court ruled that the designation of beneficiary or annuitant "is subject to change"; the filing of the change of beneficiary form with Aetna, rather than with the County, was legally adequate, because it constituted substantial compliance with the County Code; and appellant cannot "avoid" the Separation Agreement based on the Decedent's alleged incompetency, because "she gained the benefits"

---

5. The County did not suggest, either below or in this Court, that the issue of duress was not timely raised by appellant.

6. By Order dated July 23, 2002, we issued an Order remanding this case, without affirmance or reversal, for entry of judgment in conformance with Rule 2–601. The case is now ready for resolution.

under the Agreement and waited more than a year after Mr. Young's death to raise the issue. The court did not specifically address appellant's contention that she executed the Agreement under duress, nor did the court address appellant's claim that a spouse or joint annuitant takes priority over the named beneficiary. The court also failed to address appellant's contention that, even if the change in beneficiary form could be filed with Aetna, the form was ineffective because it was incomplete.

In its opinion, the court set forth the standard of review with respect to judicial review of the Board's decision, but it omitted any reference to the standard that governs the resolution of a declaratory judgment action or a summary judgment motion. Substantively, the court stated, in part:

This Court finds that the [appellant], pursuant to Paragraph 13 of the separation agreement between the [appellant] and Charles E. Young, Jr., waived any claim to Mr. Young's pension rights.

* * *

While [appellant] cites *East v. PaineWebber*, 131 Md.App. 302, 748 A.2d 1082 (2000) as authority that there was no waiver, this Court distinguishes that case from the present one.

The [appellant] specifically identified the future expectancy with the specified certificate number and both parties recognized Aetna Life as the handler of this account. She consented clearly to his freedom to name another beneficiary to any death benefits associated with the plan. [Appellant] knew the specific benefits, consented to changes and identified with specificity all rights that were waived.

This Court further rejects all of the other issues raised by the [appellant].

Specifically, the filing of the forms with Aetna Life Insurance constituted substantial compliance with the County Code, Article 7, Title 1A–101 through 1A–502, as the County retirement and pension system was entrusted with its Board

of Trustees. The Board selected Aetna Life Insurance Company to administer and manage the plan and, therefore, was an authorized agent of the County.

Mr. Charles Young filed a change in beneficiary form with Aetna and complied with the necessary requirements. In fact, [appellant] in her waiver, acknowledged Aetna and allowed for any change in beneficiary with the plan. In all circumstances, the County complied with the County Code.

With regard to whether a spouse automatically becomes a beneficiary because she may be termed an annuitant, this Court finds that this designation was subject to change by Mr. Young.

With regard to whether Mr. Young was competent when entering into the contract, appellant cannot avoid the agreement as she gained the benefits under the separation agreement. Additionally, [appellant] waited over a year to raise this issue, after Mr. Young's death.

We shall include additional facts in our discussion.

## DISCUSSION

### I.

This appeal arises from overlapping judicial proceedings, one involving an administrative agency action and the other a declaratory action.[7] Although the parties have not addressed whether the declaratory action was proper in light of the administrative action, an appellate court has the "authority" to raise on its own the issue of failure to exhaust statutory administrative remedies. *Moose v. Fraternal Order of Police, Montgomery* County, 369 Md. 476, 488, 800 A.2d 790 (2002). Because *Moose* suggests that there are circumstances when a declaratory action may be barred by the doctrine of exhaustion of administrative remedies, we shall consider, preliminarily, whether the doctrine of exhaustion of administra-

---

7. When we refer to judicial review of the Board's decision, we mean the second petition, unless otherwise noted.

tive remedies bars further consideration of the declaratory action.

Appellant filed the declaratory judgment action in the circuit court to resolve issues that the Board twice refused to address concerning the validity of the Agreement. The declaratory action was heard by the circuit court in the exercise of its original jurisdiction. With regard to the judicial review petition, the circuit court was "engaged in ordinary judicial review of a final adjudicatory decision" of a local administrative agency.[8] *Prince George's County v. Beretta U.S.A. Corp.*, 358 Md. 166, 175, 747 A.2d 647 (2000).

■ Ordinarily, in a case involving an administrative agency action, "all administrative remedies must be exhausted before a party may seek a declaratory judgment...." *Moose,* 369 Md. at 486, 800 A.2d 790; *see Montgomery County v. Broadcast Equities, Inc.,* 360 Md. 438, 452, 758 A.2d 995 (2000); *Abington Center Associates Limited Partnership,* 115 Md. App. 580, 590–91, 694 A.2d 165 (1997); *Maryland Comm'n on Human Relations v. Downey,* 110 Md.App. 493, 526 n. 11, 678 A.2d 55 (1996). The adjudicatory administrative process is generally considered to produce "the most efficient and effective results." *Secretary, Dep't of Human Resources v. Wilson,* 286 Md. 639, 645, 409 A.2d 713 (1979).

---

8. In *Baltimore County v. Penn,* 66 Md.App. 199, 503 A.2d 257 (1986), we concluded that the decision of a county board of trustees denying accidental disability benefits to police officers constituted an adjudicatory order. The Court explained, at 66 Md.App. at 205–06, 503 A.2d 257:

 We have no doubt that the trustees' decision was an "adjudicatory order." In our view an adjudicatory order is one that decides what the Administrative Procedure Act defines as a "contested case"—an agency proceeding that involves "a right, duty, statutory entitlement, or privilege of a person...." State Govt. Art. § 10-201(c)(1). *See Donocam Associates v. Washington Suburban Sanitary Commission,* 302 Md. 501, 489 A.2d 26 (1985). Certainly [the police officers'] "statutory entitlement" to pensions, or to some level of pension, was involved here.... It was not legislating; it was not rule-making; it was adjudicating two specific claims for statutory entitlement. Its decision was an adjudicatory order.

The Uniform Declaratory Judgment Act (the "Act"), Maryland Code (1974, 1995 Repl.Vol.), § 3–401 *et seq.* of the Courts and Judicial Proceedings Article ("C.J."), provides a means "to settle and afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations." C.J. § 3–402. *See generally Jackson v. Millstone,* 369 Md. 575, 801 A.2d 1034 (2002); *Howard v. Montgomery Mutual,* 145 Md. App. 549, 805 A.2d 1167, No. 404, September Term, 2001 (filed August 29, 2002). Section 3–409 of the Act provides that a court may grant a declaratory judgment

if it will serve to terminate the uncertainty or controversy giving rise to the proceeding, and if:

(1) An actual controversy exists between contending parties;

(2) Antagonistic claims are present between the parties involved which indicate imminent and inevitable litigation; or

(3) A party asserts a legal relation, status, right, or privilege and this is challenged or denied by an adversary party, who also has or asserts a concrete interest in it.

In order to have "standing" to bring a declaratory judgment action, one must have " 'a legal interest' such as . . . 'one arising out of a contract' . . . ." *Committee for Responsible Development on 25th Street v. Mayor and City Council of Baltimore,* 137 Md.App. 60, 72, 767 A.2d 906 (2001) (citation omitted). "Generally, whether a party has standing . . . depends on whether that party has an actual, real and justiciable interest susceptible of protection through litigation." *Mayor and City Council of Ocean City v. Purnell–Jarvis, Ltd.,* 86 Md.App. 390, 403, 586 A.2d 816 (1991). As the Act is "remedial," it must "be liberally construed and administered," *id.,* so that the court· may "declare rights, status, and other legal relations whether or not further relief is or could be claimed." C.J. § 3–403(a). Nevertheless, C.J. § 3–409(b) requires that, when "a statute provides a special form of remedy for a specific type of case, that statutory remedy shall be followed in lieu of a proceeding under this subtitle." *See also Bancroft*

*Information v. Comptroller*, 91 Md.App. 100, 114, 603 A.2d 1289 (1992); *Boyd v. Supervisor of Assessments of Baltimore City*, 57 Md.App. 603, 606, 471 A.2d 749 (1984).

■ A "statutory administrative and judicial review remedy [is] exclusive [when] the statutory scheme authorizing the administrative and judicial review remedy created the cause of action involved, and there existed no recognized alternative action for the . . . claims." *Zappone v. Liberty Life Insurance Co.*, 349 Md. 45, 63 n. 7, 706 A.2d 1060 (1998). Generally, "to effectuate this public policy, trial courts . . . should not act until there has been compliance with the . . . comprehensive remedial scheme." *Moose*, 369 Md. at 487, 800 A.2d 790; *see Josephson v. City of Annapolis*, 353 Md. 667, 674–78, 728 A.2d 690 (1998); *Soley v. State Comm'n on Human Relations*, 277 Md. 521, 526, 356 A.2d 254 (1976).

" 'The doctrine of primary jurisdiction is a judicially created rule designed to coordinate the allocation of functions between courts and administrative bodies.' " (Citation omitted). *Downey*, 110 Md.App. at 528, 678 A.2d 55 (citation omitted). We explained in *Downey:*

> It " 'comes into play when a court and agency have [initial] concurrent jurisdiction over the same matter and there is no statutory provision to coordinate the work of the court with that of the agency.' "This concept provides that " 'where the claim is initially cognizable in the courts but raises issues or relates to subject matter falling within the special expertise of an administrative agency,' courts should defer to the expertise of the agency." *Primary jurisdiction does not apply where "the legal issue [does] not involve an interpretation of a law administered by the agency."*

*Id.* at 528–29, 678 A.2d 55 (internal citations omitted) (emphasis added); *see also Maryland Reclamation Associates, Inc. v. Harford County*, 342 Md. 476, 490–91, 677 A.2d 567 (1996).

In *State Retirement and Pension System of Maryland v. Thompson*, 368 Md. 53, 65–66, 792 A.2d 277 (2002), the Court explained:

When an administrative agency has either primary or exclusive jurisdiction over a controversy, the parties to the controversy must ordinarily exhaust their administrative remedies before seeking a judicial resolution, *State v. State Board of Contract Appeals,* 364 Md. 446, 457, 773 A.2d 504, 510 (2001), and a conclusion that the plaintiff failed to do so normally results in a dismissal of the action, either by the trial court initially or by direction of an appellate court. *Id.* at 458–59, 773 A.2d 504. *See also Board of License Comm'rs v. Corridor Wine, Inc.,* 361 Md. 403, 761 A.2d 916 (2000); *Quesenberry v. WSSC,* 311 Md. 417, 535 A.2d 481 (1988). That is because, although the court may well have subject matter jurisdiction over the action before it, the exhaustion doctrine bars the court from exercising that jurisdiction, thereby gratifying the paramount legislative intent that the matter be dealt with first by the Executive Branch agency.

 When an administrative remedy is primary, declaratory or equitable jurisdiction may not be used "solely to abort that administrative proceeding." *Broadcast Equities,* 360 Md. at 452, 758 A.2d 995. Thus, "where the only recognized avenue for relief is the administrative and judicial review proceedings, the claimant may not circumvent those proceedings by a declaratory judgment or equitable action. . . ." *Id.* at 456, 758 A.2d 995. Rather, a litigant is usually required to exhaust administrative remedies before pursuing a declaratory judgment as a means of obtaining a statutory interpretation. *Moose,* 369 Md. at 493, 800 A.2d 790; *Broadcast Equities, Inc.,* 360 Md. at 452, 758 A.2d 995.

*Moose* is instructive. There, a police officer was suspended from a county police department after he was accused of using excessive force in the performance of his duties. An emergency suspension hearing was held before a one-member hearing board, which continued the suspension. The officer and the Fraternal Order of Police, appellees, subsequently filed a "Verified Petition in Support of Show Cause Order and/or Complaint for Declaratory Relief" in the circuit court, challenging the police department's failure to convene a three-

member board. The circuit court found the administrative hearing unfair and ordered a new hearing conducted by only one member. Prior to the second hearing, appellees filed a declaratory action requiring a hearing conducted by a three-member board. After the circuit court concluded that the applicable statute did not require a three-member hearing board, appellees appealed to this Court. We held that we could not reach the merits because the circuit court had failed in the declaratory action to issue a written order "fully addressing the rights of the parties." *Moose,* 369 Md. at 481, 800 A.2d 790. We remanded to the circuit court for a determination of all the issues.

On remand, the circuit court determined that the applicable statute and regulation required a three-member emergency hearing board. The Court of Appeals granted certiorari and reversed. It held that, at every judicial stage, the matter should have been dismissed, because the appellees "failed to exhaust their administrative remedies as is required before the commencement of either of the declaratory judgment actions." *Id.* at 482, 800 A.2d 790. It added: "Because the parties had not exhausted all administrative remedies, neither the Circuit Court, nor the Court of Special Appeals, should have addressed any issues in the framework of declaratory judgment actions." *Id.* Further, the Court stated:

> At the time of appellees['] initial filing of an action in the Circuit Court, there had not been, and, in fact, as far as the record reflects, has never been to this point, a subsequent hearing on the merits. Therefore, administrative remedies had not at that time, and never have, been exhausted. A declaratory judgment action was, therefore, not permitted at that time, or since, or now. . . .

*Id.* at 483, 800 A.2d 790.

■ This case is altogether unlike *Moose.* Most notably, appellant did not circumvent or subvert the administrative process.[9] To the contrary, appellant had two hearings before

---

9. We observe that the County has not suggested that the issues that were the subject of the declaratory action should have been resolved by

the Board, and she did not file the declaratory action until after the first hearing held on May 26, 1998, when the Board expressly refused to address the various issues concerning the validity of the Agreement and the change of beneficiary form. Thereafter, the circuit court stayed the declaratory action and remanded the administrative action to the Board. Although on remand the Board acknowledged that resolution of these issues could be determinative of appellant's rights, the Board refused to address the issues pertaining to the Agreement or the Decedent's competency to execute the change of beneficiary form. It said: "The Board has determined that it has no jurisdiction to determine the enforceability of a private contract. . . . The Board has also determined that it has no jurisdiction to determine whether Mr. Young was competent at the time the Change in Beneficiary Form was executed." Instead, it "presum[ed]" the validity of both the Agreement and change of beneficiary form and then proceeded to resolve those issues that it regarded as within its domain.

It is also noteworthy that, as a contract, the Agreement is subject to the same general rules of construction applicable to other contracts. *Langston v. Langston,* 366 Md. 490, 505–06, 784 A.2d 1086 (2001); *Bruce v. Dyer,* 309 Md. 421, 433, 524 A.2d 777 (1987); *Moore v. Moore,* 144 Md.App. 288, 303, 797 A.2d 839 (2002); J. Fader & R. Gilbert, MARYLAND FAMILY LAW, § 13–6(a)(2nd ed. 1995)("Fader"). Like other contracts, "[t]he validity of a separation agreement may be determined by filing an action for declaratory relief," even without a filing for divorce. Fader, § 13–3(d)(3); *see Hale v. Hale,* 66 Md.App. 228, 233–34, 503 A.2d 271 (1986).

The court below consolidated the administrative and declaratory actions in the concurrent exercise of original and "appellate" jurisdiction, and issued one opinion involving both cases. *See Gisriel v. Ocean City Board of Supervisors of Elections,* 345 Md. 477, 495, 693 A.2d 757 (1997) (explaining that, when

the Board. Nor has it argued that the declaratory action was an improper attempt to avoid the administrative process.

§ 12–302 of the Courts and Judicial Proceeds Article was first enacted, the circuit court's review of an agency decision was referred to as an exercise of "appellate jurisdiction"), *cert. denied,* 522 U.S. 1053, 118 S.Ct. 702, 139 L.Ed.2d 645 (1998). The case of *Levitz Furniture Corp. v. Prince George's County,* 72 Md.App. 103, 527 A.2d 813, *cert. denied,* 311 Md. 286, 533 A.2d 1308 (1987), is instructive. It involved the consolidation of two actions, one seeking judicial review of the findings of the Prince George's County Human Rights Commission (the "commission") and the other an enforcement action brought by the commission. On appeal, Judge Bloom, writing for the Court, concluded that we had jurisdiction to review the enforcement action. The Court stated, at 72 Md.App. at 108, 527 A.2d 813:

> Although § 12–302(a) enables [the] County to deny its citizens the right to enlist our review of the circuit court's exercise of appellate jurisdiction, that statute does not enable the county to preclude our review of the lower court's exercise of original jurisdiction. Levitz is entitled to appeal the circuit court's judgment because it was rendered in an equity proceeding filed by the appellees in that court. *See* Md. Cts. & Jud. Proc.Code Ann. § 12–301 (1984 Repl.Vol.).

*Yarema v. Exxon Corp.,* 305 Md. 219, 503 A.2d 239 (1986), is also helpful. There, the Court recognized that, "unless the trial court clearly intends that a joint judgment be entered disposing of all cases simultaneously," *id.* at 236, 503 A.2d 239, consolidated cases are generally not treated as one case for the purpose of Rule 2–602. "[I]nstead, each one of the cases is to be treated as *a* separate action." *Id.*

The issues that the Board considered do not "override or defeat whatever private rights exist" with respect to the Agreement or the enforceability of the beneficiary form. Nor does the Board, "in its workings," control the enforceability of these documents. *Perry v. Board of Appeals,* 211 Md. 294, 299, 127 A.2d 507 (1956) (concerning zoning). As important as the issues concerning the Agreement and change of beneficiary form are to the ultimate resolution of this case, they

certainly are not matters within the usual adjudicatory function of the Board.

Accordingly, we conclude that the doctrine of exhaustion of administrative remedies does not bar our consideration of the declaratory action as to those claims concerning the validity of the Agreement or the Decedent's capacity to execute the change of beneficiary form. Nevertheless, because Counts III and IV of the declaratory action duplicate issues presented to and decided by the Board, we shall not address those claims in connection with the declaratory action.

As a guide to our discussion of the remaining issues, we shall outline them:

1. Under the Plan, does a surviving spouse have priority over a beneficiary with regard to the recovery of pension benefits?

2. Even if the beneficiary takes priority over the surviving spouse, is the change of beneficiary form valid, given that it was filed with Aetna, rather than with the County, and it was not complete on its face?

3. If the spouse has priority as to benefits under the Plan, may a spouse, as a matter of law, waive such rights pursuant to a marital separation agreement when, as here, the pension plan is not subject to ERISA?

4. If a spouse can lawfully waive rights to benefits, is the waiver language in this Agreement sufficient to accomplish that purpose?

5. Even if a spouse can waive his or her rights to benefits by way of a separation agreement, is the Agreement in this case valid and enforceable in light of the claims of duress and mental incapacity?

## II.

We shall first focus on appellant's claim that, under the County Code, a surviving spouse takes priority over a beneficiary in regard to pension benefits. We shall also consider whether the County was entitled to consider the change of

beneficiary form, given that it was filed with Aetna, rather than with the County.

As the surviving spouse, appellant claims she "is designated to receive the survivor's pension benefits . . . at the time of the participant's death." Therefore, she contends that the Board erred in concluding, based on A.A.C.C. § 5–210(b), that benefits are paid first to the surviving beneficiary and, if the beneficiary does not survive, then to the surviving spouse, at the option of the Personnel Officer. She maintains that, under A.A.C.C. § 5–211(f) and the "statutory design" of the Plan, benefits are first payable to the participant's surviving spouse. According to Ms. Young, the beneficiary is, in effect, third in line; the beneficiary receives "benefits only after the spouse and unmarried minor children of the participant no longer are entitled to receive benefits," and then only "if those events occur within five years of the date the participant . . . retired under § 5–211(g)." Appellant also claims that the court erred in its interpretation of the County Code when it "concluded that the designation of spouse as a beneficiary was subject to change by Mr. Young."

In the original Designation/Change of Beneficiary Form, appellant was named as the primary beneficiary. According to appellant, under the statutory scheme, "the status of a 'spouse' can only be terminated by divorce or annulment, not by electing to name a different beneficiary." She adds: "The Code does not authorize a way to deprive one's spouse at [the] time of the participant's death from receiving the pension death benefits." Therefore, despite the Separation Agreement or the change of beneficiary form filed with Aetna, appellant contends that "Gail Young, as the 'spouse' of Mr. Young and so designated in the official pension file, is entitled to receive the pension benefits as a matter of law." Appellant states:

> Under the pension plan, the spouse of record was Gail Young. Prior to Mr. Young's death, her status was a revocable contingent interest that Mr. Young could have terminated by divorce or annulment and it was contingent on being the spouse at the date of death of Mr. Young. Her

interest could not be eliminated by a waiver in the separation agreement absent a divorce decree incorporating the agreement. Once Mr. Young died, Gail Young had a contractual interest created. She was the spouse of record with the entitlement to receive the funds in accordance with the County pension plan. The Personnel Officer was not permitted to rely on external information to contradict this designation.

Appellant also argues that she was designated as the "joint annuitant," and therefore she is entitled to 100% of the pension benefit. In her view, "this is the status mandated by § 5–211(f)(1) which continues for the spouse's lifetime or until she remarries." Thus, appellant asserts that the County had a contractual duty to pay her the death benefits as the spouse under § 5–211(f).

In addition, appellant contends that the County had no authority to consider the change of beneficiary form, because a Personnel Officer may not review documents outside the retirement file. She argues that, as a matter of law, "[t]he Code must authorize the Personnel Officer to rely on anything outside the personnel Office official pension file." Alternatively, appellant maintains that the form was defective and thus unenforceable, because it was not fully completed.

Conversely, appellee contends that, pursuant to the Separation Agreement, appellant waived her rights to benefits. Appellee also argues that the Personnel Office is vested with "considerable latitude in what materials and documents are to be used in making pension determinations." Thus, the County urges us to affirm.

Because the issues concerning the County Code were ones that the Board considered, we pause to review the principles of judicial review of administrative agency decisions. Judicial review of an administrative agency's decision is narrow. *Total Audio–Visual Systems, Inc. v. Department of Labor, Licensing and Regulation,* 360 Md. 387, 394, 758 A.2d 124 (2000); *United Parcel Serv., Inc. v. People's Counsel,* 336 Md. 569, 576, 650 A.2d 226 (1994); *Meadows of Greenspring*

*Homeowners Ass'n v. Foxleigh Ent. Inc.,* 133 Md.App. 510, 514, 758 A.2d 611 (2000). Moreover, we review the decision of the agency, not the decision of the lower court. *Jordan Towing, Inc. v. Hebbville Auto Repair, Inc.,* 369 Md. 439, 800 A.2d 768 (2002); *Gigeous v. ECI,* 363 Md. 481, 495, 769 A.2d 912 (2001); *Baltimore Lutheran High Sch. Ass'n v. Employment Sec. Admin.,* 302 Md. 649, 662, 490 A.2d 701 (1985); *Uninsured Employers' Fund v. Pennel,* 133 Md.App. 279, 287–88, 754 A.2d 1120 (2000); *Department of Labor v. Muddiman,* 120 Md.App. 725, 733, 708 A.2d 47 (1998). As to an agency's final decision, we consider " '(1) the legality of the decision and (2) whether there was substantial evidence from the record as a whole to support the decision.' " *State Highway Admin. v. David A. Bramble, Inc.,* 351 Md. 226, 238, 717 A.2d 943 (1998)(quoting *Dep't. of Labor v. Hider,* 349 Md. 71, 77–78, 706 A.2d 1073 (1998)); *Mayberry v. Bd. of Educ. Anne Arundel County,* 131 Md.App. 686, 701, 750 A.2d 677 (2000).

Factual findings made by the Board are binding upon a reviewing court, so long as they are supported by substantial evidence in the record. *United Parcel Serv.,* 336 Md. at 577, 650 A.2d 226; *Mortimer v. Howard Research,* 83 Md.App. 432, 441, 575 A.2d 750, *cert. denied,* 321 Md. 164, 582 A.2d 499 (1990). Substantial evidence is defined as " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Bulluck v. Pelham Wood Apartments,* 283 Md. 505, 512, 390 A.2d 1119 (1978) (citation omitted); *see Gigeous,* 363 Md. at 497, 769 A.2d 912; *Wisniewski v. Department of Labor,* 117 Md.App. 506, 516–17, 700 A.2d 860 (1997) (" 'Substantial evidence means more than a "scintilla of evidence," such that a reasonable person could come to more than one conclusion.' ") (Citation omitted). In other words, the court must ask whether "reasoning minds could reach the same conclusion from the facts relied upon by the Board." *Hider,* 349 Md. at 78, 706 A.2d 1073; *see Muddiman,* 120 Md.App. at 734, 708 A.2d 47. "Even if the reviewing court could have reached a different result based on the evidence before the agency, the court must uphold the agency's determination if it is rationally supported by evidence in the

record." *Department of Econ. and Employment Dev't v. Lilley,* 106 Md.App. 744, 754–74, 666 A.2d 921 (1995).

Moreover, the reviewing court "must not . . . make independent findings of fact. . . ." *Baltimore Lutheran,* 302 Md. at 662, 490 A.2d 701. Rather, "[b]ecause of the deference [we must] accord [to] the expertise of an administrative agency acting within the sphere of its regulated activities, we refrain from making our own independent findings of fact or substituting our judgment for that of the agency when the record contains substantial evidence supporting the agency's determination." *Marsheck v. Board of Trustees of Fire & Police Employees' Retirement System of City of Baltimore,* 358 Md. 393, 402, 749 A.2d 774 (2000); *see Jordan Towing, Inc.,* 369 Md. at 439, 450–51, 800 A.2d 768; *Board of Physician Quality Assurance v. Banks,* 354 Md. 59, 68–69, 729 A.2d 376 (1999). Further, "the tasks of drawing inferences from the evidence and resolving conflicts in the evidence àre exclusively the function" of the agency. *Motor Vehicle Administration v. Karwacki,* 340 Md. 271, 283–84, 666 A.2d 511 (1995); *Board of County Comm'rs v. Holbrook,* 314 Md. 210, 218, 550 A.2d 664 (1988); *Westinghouse Elec. Corp. v. Callahan,* 105 Md.App. 25, 35, 658 A.2d 1112 (1995); *Moseman v. County Council of Prince George's County,* 99 Md.App. 258, 265, 636 A.2d 499, *cert. denied,* 335 Md. 229, 643 A.2d 383 (1994). As the Court said in *Snowden v. Mayor and City Council of Baltimore,* 224 Md. 443, 168 A.2d 390 (1961), " 'The Court may not substitute its judgment on the question whether the inference drawn is the right one or whether a different inference would be better supported. The test is reasonableness, not rightness.' " *Id.* at 448, 168 A.2d 390 (citation omitted).

In contrast, we do not defer to the agency's legal conclusions. In other words, we may always resolve whether the agency made an error of law and we are not bound by the Board's interpretation of the law. *Gigeous,* 363 Md. at 496, 769 A.2d 912. Rather, "when the question before the agency involves one of statutory interpretation or an issue of law, our

review is more expansive." *Muddiman,* 120 Md.App. at 734, 708 A.2d 47.

 Nevertheless, the agency's decision is considered *prima facie* correct, and an appellate court must view that decision in the light most favorable to the agency. *Giant Food, Inc. v. Department of Labor, Licensing, and Regulation,* 356 Md. 180, 185, 738 A.2d 856; *Marsheck,* 358 Md. at 402, 749 A.2d 774; *Board of Education v. Paynter,* 303 Md. 22, 35–36, 491 A.2d 1186 (1985). Moreover, "[e]ven with regard to some legal issues, a degree of deference should be accorded the position of the administrative agency." *Banks,* 354 Md. at 69, 729 A.2d 376. Therefore, "an administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts." *Id.* As the *Banks* Court noted, "the expertise of the agency in its own field should be respected." *Id.* Similarly, we defer to an agency's interpretation of its own regulations. *Maryland Transportation Authority v. King,* 369 Md. 274, 288, 799 A.2d 1246 (2002); *Division of Labor v. Triangle,* 366 Md. 407, 416–417, 784 A.2d 534 (2001); *Marzullo v. Kahl,* 366 Md. 158, 172–173, 783 A.2d 169 (2001).

We begin our analysis with a review of the provisions of the County Code relevant to the Plan. The Plan is administered by a "Personnel Officer." A.A.C.C. § 5–104(a). The Personnel Officer possesses "powers necessary for proper administration of the plan." A.A.C.C. § 5–104(b). Under § 5–104(b)(1)–(5), the Personnel Officer has the power:

> (1) to prescribe procedures to be followed by employees in filing application for benefits and for furnishing of evidence necessary to establish employees' right to benefits;

> (2) to make determination as to the rights of an employee applying for or receiving retirement benefits and to afford a mechanism for adjusting the complaint of an employee dissatisfied with the determination;

> (3) to develop procedures for determining services of employees, and after affording employees an opportunity

after written notice to make objection with respect to the procedures, to establish service in advance of retirement;

(4) to authorize disbursements from the pension fund in accordance with the plan and to establish necessary procedures for authorizing disbursements; and

(5) to establish policies and standards and make determinations concerning total and permanent disability for the purposes of this title.

A.A.C.C. § 5–207 is also pertinent. It provides:

§ 5–207. Contingent annuitant option.

If a participant at the time of retirement does not have an eligible spouse or minor child, the participant may elect to receive pension benefits of actuarially equivalent value under the contingent annuitant option by filing written notice with the Personnel Officer prior to the participant's normal retirement date. If the election of this optional form is in effect on the participant's normal retirement date, the participant shall receive a reduced amount of pension benefits during the participant's lifetime and following the participant's death a pension benefit shall be continued and paid for life to the participant's surviving contingent annuitant, in the same reduced amount, or two-thirds or 50% of the benefit if so specified in the election; but if the participant dies during the five-year period immediately following the participant's date of retirement, pension payments which become payable to the contingent annuitant during the balance of the five-year period shall be in the same yearly amount as the pension payments which were payable to the participant....

A.A.C.C. § 5–210 is titled "Beneficiaries." It states:

§ 5–210. Beneficiaries.

(a) A participant *shall* designate *a spouse and a beneficiary* by filing with the Personnel Officer *written notice of spouse and beneficiary* on a form satisfactory to the Personnel Officer.

(b) *The participant may change the designation of spouse or beneficiary* by filing written notice on a form

satisfactory to the Personnel Officer. The designation of a beneficiary shall take effect as of the date of execution of the notice of change of beneficiary whether or not the participant is living at the time of such filing. The pension fund is not prejudiced on account of any payments made under this title before receipt of the notice by the Personnel Officer. *If no name has been filed or if the named beneficiary does not survive the participant, the benefits that would have been paid to the named beneficiary shall be paid at the option of the Personnel Officer to either the participant's surviving spouse,* the participant's surviving children in equal shares, or the executor or administrator of the participant.

(Emphasis added).

A.A.C.C. § 5–211 is also relevant. It provides, in part:

§ 5–211. Death benefits.

(a) Monthly death benefits shall be paid under subsection (b) of this section if:

(1) a participant's death occurs before the participant's date of retirement, or before normal retirement date with respect to a participant who was determined to be totally and permanently disabled in accordance with 21 5–208(a)(1) of this subtitle; and

(2) before the participant's date of death or date of disability, whichever first occurs, the participant was making participant's contributions under this title.

(b) The following shall apply when the requirements of subsection (a) are satisfied:

(1) *if the participant is survived by a spouse, the spouse is eligible to receive monthly death benefit payments* in an amount determined in this section commencing as of the first day of the month coinciding with or next following the participant's death and ceasing as of the earlier of the spouse's date of death or date of remarriage; or

(2) *if the participant is survived by one or more unmarried children under the age of 18 years and is not survived by a spouse, death benefit payments shall be paid to the*

*unmarried children under 18 years of age* commencing with the first day of the month following the participant's death. Death benefit payments shall be payable to the participant's unmarried children under the age of 18 years as a group, with each child becoming ineligible to receive payments on attaining the age of 18 years or on marriage, whichever occurs first; or

(3) *If the participant is survived by a spouse, death benefit payments shall be paid as provided under paragraph (1)* of this subsection and, in addition, after the death of the spouse, if there is a surviving unmarried child under the age of 18 years, death benefit payments shall be paid as provided under paragraph (2) of this subsection, notwithstanding any terms of that paragraph to the contrary.

\* \* \*

(f)(1) If a participant who has not elected a contingent annuitant option in accordance with § 5–207 of this subtitle dies after the participant's date of retirement ... pension payments payable to the participant shall continue to be paid to the participant's spouse:

(i) for a tier one employee [ [10]] in the same amount as the pension payments that were payable to the participant; ....

(ii) for a tier two employee ....

\* \* \*

(2) If, upon the death or remarriage of a spouse who is receiving payments, there are participant's surviving unmarried minor children, payments in the same amount that would have been payable to the spouse shall become payable to the children commencing with the first month following the spouse's death or remarriage. The payment shall be payable to such children as a group, with each child becoming ineligible to receive any part of the payment on becom-

---

**10.** The Board of Appeals found that Mr. Young was a tier one participant. Appellee has not challenged that finding.

ing an adult or on marriage, whichever first occurs. As of the date the participant's unmarried children become adults, no further benefits shall be payable except as provided in subsection (g) of this section.

(3) *The retirement benefits of a participant who is not survived by a spouse shall become payable to the partici- pant's unmarried minor children commencing* on the first day of the month following the participant's death in the same amount that would have been payable to a surviving spouse. The payment shall be payable to such children as a group, with each child becoming ineligible to receive any part of the payment on becoming an adult or on marriage, whichever first occurs. As of the date the participant's unmarried children become adults, no further benefits shall be payable except as provided in subsection (g) of this section.

(g) *On cessation of pension payments to the last survivor under subsection (f) of this section, within the five-year period commencing on the participant's date of retirement . . . pension payments in the amount payable with respect to the participant's coverage shall be continued and paid to the participant's beneficiary* during the remainder of that period. If the benefits paid under this title do not equal the amount of the participant's contributions together with cred- ited interest to the participant's date of retirement or disability, the excess contributions with credited interest shall be paid in a lump sum to the payee last entitled to benefits under this title or the estate of the payee.

(Emphasis added).

 To construe the provisions cited above, we must consider the well-honed principles of statutory construction. Local ordinances are interpreted under the same canons of construction that apply to the interpretation of State statutes. *Howard Research and Dev. Corp. v. Concerned Citizens for the Columbia Concept,* 297 Md. 357, 364, 466 A.2d 31 (1983); *Ahalt v. Montgomery County,* 113 Md.App. 14, 25, 686 A.2d 683 (1996). "The interpretation of a statute is a judicial

function." *Rouse–Fairwood Development Limited Partnership v. Supervisor of Assessments,* 138 Md.App. 589, 619, 773 A.2d 535 (2001). Therefore, we review, *de novo,* the interpretation of a statute made by an agency or a lower court. *See Auction of Estate Representatives v. Ashton,* 354 Md. 333, 341, 731 A.2d 441 (1999). In our effort to effectuate legislative intent, however, we "ordinarily give some weight to the construction given the statute by the agency responsible for administering it." *Magan v. Medical Mut. Liab. Ins. Soc'y. of Md.,* 331 Md. 535, 546, 629 A.2d 626 (1993); *Rouse–Fairwood,* 138 Md.App. at 619, 773 A.2d 535.

A " 'cardinal rule of statutory interpretation is to ascertain and effectuate the intention of the legislature.' " *Degren v. State,* 352 Md. 400, 417, 722 A.2d 887 (1999)(quoting *Oaks v. Connors,* 339 Md. 24, 35, 660 A.2d 423 (1995)); *see State v. Green,* 367 Md. 61, 81, 785 A.2d 1275 (2001); *Webster v. State,* 359 Md. 465, 479, 754 A.2d 1004 (2000); *Board of License Comm'rs. v. Toye,* 354 Md. 116, 122, 729 A.2d 407 (1999). " 'The primary source of legislative intent is ... the language of the statute itself.' "*State v. Pagano,* 341 Md. 129, 133, 669 A.2d 1339 (1996) (citation omitted); *see Adamson v. Correctional Med. Servs.,* 359 Md. 238, 251, 753 A.2d 501 (2000); *Huffman v. State,* 356 Md. 622, 628, 741 A.2d 1088 (1999). In interpreting a statute, we assign the words their ordinary and natural meaning. *Lewis v. State,* 348 Md. 648, 653, 705 A.2d 1128 (1998); *Gardner v. State,* 344 Md. 642, 647–48, 689 A.2d 610 (1997); *Whack v. State,* 338 Md. 665, 672, 659 A.2d 1347 (1995). Generally, we "will not divine a legislative intention contrary to the plain language of a statute or judicially insert language to impose exceptions, limitations or restrictions not set forth by the legislature." *Langston v. Langston,* 366 Md. 490, 515, 784 A.2d 1086 (2001). Similarly, "[w]e neither add nor delete words to a clear and unambiguous statute to give it a meaning not reflected by the words the Legislature used or engage in a forced or subtle interpretation in an attempt to extend or limit the statute's meaning." *Taylor v. NationsBank,* 365 Md. 166, 181, 776 A.2d 645 (2001); *see Mid–Atlantic Power Supply Assoc. v. Public Service*

*Comm'n of Md.,* 361 Md. 196, 203–04, 760 A.2d 1087 (2000) (recognizing that "we neither add nor delete words to a clear and unambiguous statute to give it a meaning not reflected by the words the Legislature used or engage in a forced or subtle interpretation in an attempt to extend or limit the statute's meaning").

Ordinarily, "if the plain meaning of the statutory language is clear and unambiguous, and consistent with both the broad purposes of the legislation, and the specific purpose of the provision being interpreted, our inquiry is at an end." *Breitenbach v. N.B. Handy Co.,* 366 Md. 467, 473, 784 A.2d 569 (2001). So long as "the language [of a statute] is clear and unambiguous, there is usually no need to look further." *Gary v. State,* 341 Md. 513, 521, 671 A.2d 495 (1996). On the other hand, the plain meaning rule is "elastic, rather than cast in stone[,]" and if "persuasive evidence exists outside the plain text of the statute, [pertaining to the meaning of a provision,] we do not turn a blind eye to it." *Adamson,* 359 Md. at 251, 753 A.2d 501. Rather, "in determining a statute's meaning, courts may consider the context in which a statute appears, including related statutes and legislative history." *Ridge Heating, Air Conditioning & Plumbing v. Brennen,* 366 Md. 336, 350–51, 783 A.2d 691 (2001). "We may also consider the particular problem or problems the legislature was addressing, and the objectives it sought to attain." *Sinai Hosp. of Baltimore v. Dep't of Employment and Training,* 309 Md. 28, 40, 522 A.2d 382 (1987). "This enables us to put the statute in controversy in its proper context and thereby avoid unreasonable or illogical results that defy common sense." *Adamson,* 359 Md. at 252, 753 A.2d 501.

Of significance here, we are required to construe statutory provisions as a whole, so that all provisions are considered together and, to the extent possible, reconciled and harmonized. *Curran v. Price,* 334 Md. 149, 172, 638 A.2d 93 (1994). In *Office of People's Counsel v. Maryland PSC,* 355 Md. 1, 733 A.2d 996 (1999), the Court said:

We are ... required to interpret the statute as a whole, for "[w]here the statute to be construed is a part of a statutory scheme, the legislative intention is not determined from that statute alone, rather it is to be discerned by considering it in light of the statutory scheme." Moreover, neither the words in the statute nor any portion of the statutory scheme should be read "so as to render the other, or any portion of it, meaningless, surplusage, superfluous, or nugatory."

*Id.* at 22, 733 A.2d 996 (internal citation omitted).

It is also noteworthy that a statutory provision should not be viewed in isolation. When construing several statutory provisions involving the same subject matter, a harmonious interpretation of the statutes is "strongly favor[ed]." *Maryland State Police v. Warwick Supply & Equip. Co.*, 330 Md. 474, 483–84, 624 A.2d 1238 (1993); *see Department of Natural Resources v. France*, 277 Md. 432, 461, 357 A.2d 78 (1976)(stating that, "[w]here two statutory provisions are neither irreconcilable nor mutually repugnant, they should be construed in harmony with their respective objects and tenor") (citations omitted). Thus, "[a]ll relevant parts ... should be read together and, to the extent possible, construed in harmony." *Curry v. Dept. of Public Safety & Correctional Servs.*, 102 Md.App. 620, 628, 651 A.2d 390 (1994), *cert. dismissed*, 340 Md. 175, 665 A.2d 1038 (1995). In addition, we may also consider " 'the consequences resulting from one meaning rather than another, and adopt that construction which avoids an illogical or unreasonable result, or one which is inconsistent with common sense.' " *Chesapeake Charter, Inc. v. Anne Arundel County Board of Educ.*, 358 Md. 129, 135, 747 A.2d 625 (2000) (citation omitted); *see Romm v. Flax*, 340 Md. 690, 693, 668 A.2d 1 (1995).

When two provisions, one general and the other specific, appear to cover the same subject but seem to conflict, the specific provision is controlling and prevails over the general enactment. *France*, 277 Md. at 461–62, 357 A.2d 78 (" 'Where there is a specific enactment and a general enactment which,

in its most comprehensive sense, would include what is embraced in the former, the particular enactment must be operative, and the general enactment must be taken to affect only such cases within its general language as are not within the provisions of the particular enactment.'") (citation omitted; internal quotations omitted). Therefore, when reconciling a specific and a general provision of a statute, a court should give effect to the specific provision in its entirety, while retaining as much of the general provision as is reasonably possible. *See* 1A Norman L. Singer, SUTHERLAND STATUTES AND STATUTORY CONSTRUCTION §§ 23.06, 23.09, 23.16 (5th ed.1993); *see also Farmers & Merchants National Bank of Hagerstown v. Schlossberg*, 306 Md. 48, 63, 507 A.2d 172 (1986)(holding general enactment impliedly repealed by specific enactment); *Lumbermen's Mutual Casualty Co. v. Insurance Comm'r*, 302 Md. 248, 268, 487 A.2d 271 (1985)("[W]here one statutory provision specifically addresses a matter, and another more general statutory provision also may arguably cover the same matter, the specific statutory provision is held to be applicable and the general provision is deemed inapplicable."); *Criminal Injuries Comp. Bd. v. Gould*, 273 Md. 486, 495, 331 A.2d 55 (1975).

The Board concluded that the Decedent was entitled to file a change of beneficiary form with Aetna. It said:

Mr. Young filed a change of beneficiary notice on a form provided by Aetna, the paid payer of benefits to the County's retirees. The Board finds that this form, since it was supplied to the participant by Aetna, meets the requirement that the form be satisfactory to the Personnel Officer. *See, id.* The Board also finds that Mr. Young properly filed the form since it was delivered to Aetna. The Board requires that the designation of spouses and beneficiaries be filed with the Personnel Officer. *See, id.*, Section 5–210(a). Aetna is the county's agent for purposes of administering the pension program. The correspondence regarding the plan is generated by Aetna. The participants in the plan deal with Aetna. The Board finds that the requirement that the forms be filed with the Personnel Officer is met when a

participant files the form with Aetna, as agent for the County.

The most recent designation/change of beneficiary form filed by Mr. Young reflected that the beneficiary of his pension is Susan K. Grier, the sister of Mr. Young. The Separation Agreement states that Mr. Young, "may name any beneficiary to any death benefits associated with" his Aetna annuity. The Board finds that together these items constitute a proper designation of beneficiary by Mr. Young.

With respect to whether a Personnel Officer may consider information in Aetna's file, such as the Agreement and the change in beneficiary form, each side relies on the County Code's silence. We disagree with appellant that the Code's silence on this issue means that the Personnel Officer was barred from reviewing the change of beneficiary form because it was filed with Aetna. *Cf. Allfirst v. Department of Health and Mental Hygiene,* 140 Md.App. 334, 780 A.2d 440 (2001) (determining that the absence of a statutory provision in Health General Article § 19–337, expressly permitting the collection of attorneys' fees, did not mean that a party was barred from seeking attorneys' fees). If the County wanted to prohibit the Personnel Officer from reviewing documents affecting the rights of a Plan participant or his heirs, it would have said so. Moreover, § 5–104(b) states that the "Personnel Officer has the powers *necessary for proper administration of the plan, including* " the five duties mentioned earlier. Notably, the County Code does not limit the Personnel Officer's authority to the five enumerated powers; instead, it lists several examples of actions considered necessary to the proper administration of the Plan. Therefore, we are persuaded that the Personnel Officer was permitted to administer the Plan in a way he or she deemed "necessary."

That the Decedent filed a form with Aetna that the County could consider does not mean that the beneficiary named in that form necessarily had priority with respect to the receipt of benefits. A.A.C.C. § 5–210 is titled "Beneficiaries," while § 5–211 specifically concerns "Death benefits." Section 5–

210(b) seems to favor the County's position that a beneficiary has priority over a surviving spouse in regard to benefits under the Plan, while § 5–211 suggests that a spouse has priority.

In its Memorandum of Opinion of August 11, 1999, the Board concluded that "the Personnel Officer rightfully denied" appellant's request for pension benefits. It reasoned:

Participants in the County's pension program may change the designated beneficiary. *See,* Anne Arundel County Code (the "Code"), Article 7, Pension Plans, Section 5–210(b).

\* \* \*

The pension plan clearly favors the payment of benefits to the named "beneficiary" over payments to a "spouse." Only if no name has been filed or if the named beneficiary does not survive the participant are the benefits permitted to be paid to others. *See, id.,* Section 5–210(b). The benefits that would have been paid to the named beneficiary can then be paid, "at the option of the Personnel Officer to either the participant's surviving spouse, the participant's surviving children in equal shares, or the executor or administrator of the participant." *See, id.*

The Board notes, however, that if the Circuit Court determines that Ms. Young did not waive her rights to Mr. Young's pension in th Separation Agreement and the Change of Beneficiary From is invalid due to Ms. Young's incompetence then Ms. Young may be entitled to Mr. Young's pension benefits. Unfortunately, this Board has no jurisdiction to decide such matters.

 Noticeably absent from the Board's opinion is any reference to § 5–211. Nor did the Board reconcile the apparent inconsistency between § 5–211 and § 5–210. A.A.C.C. § 5–211(f) and (g) refer to the circumstances under which death benefits are payable to the spouse, unmarried minor children, and, last, to the beneficiary. Subsection 5–211(f)(2) states that if the spouse who is receiving payments either

remarries or dies, and if there are surviving, unmarried minor children, then the minor children would recover the remainder of the benefits until they reach adulthood. Under § 5–211(f)(3), if there is no surviving spouse, then the unmarried, minor children receive the benefits until they reach the age of majority. Section 5–211(g) provides that a beneficiary is entitled to receive the death benefits if there is no surviving spouse *and* no surviving, unmarried minor child *and* the claim is asserted within five years of the participant's retirement.

With respect to A.A.C.C. § 5–211, then, the rights of a beneficiary come into play only when there is no eligible spouse or child. The language of this section plainly provides that a beneficiary's rights follow those of the surviving spouse or minor children. Therefore, we agree with appellant that "[i]t is only after considering this classification of unmarried minor children that under subsection 5–211(g), a 'beneficiary' is considered for payment of the death benefit."

We note, too, that § 5–211(f) provides that benefits *shall* be paid to the spouse if no contingent annuitant is elected. Section 5–211(f)(1) appears to be a firm directive with respect to pension payments. Ordinarily, the term "shall" "indicates a mandatory intent, unless the context of the statute indicates otherwise." *Burch v. State,* 358 Md. 278, 284, 747 A.2d 1209 (2000); *see In Re Anthony R.,* 362 Md. 51, 60, 763 A.2d 136 (2000); *In Re Abiagail C.,* 138 Md.App. 570, 581, 772 A.2d 1277 (2001) ("Depending on the context, placement, and use of the word 'shall,' and the nature of the constitutional provision or statute in which it appears, the word may have a mandatory connotation, so as to require that the action that 'shall' be done must be done, or may be directory in meaning, so as to exhort the doing of the thing that 'shall' be done without requiring it."); *Branch v. McGeeney,* 123 Md.App. 330, 356, 718 A.2d 631 (1998); *Witt v. Ristaino,* 118 Md.App. 155, 172, 701 A.2d 1227 (1997).

We conclude that the Board's reliance on A.A.C.C. § 5–210(b) was misplaced. Looking at the statutory scheme as a whole, and recognizing that a specific provision (Death Bene-

fits) prevails over a general provision (Beneficiaries), the specific enactment applies. Therefore, the Decedent's filing of a change of beneficiary form did not defeat appellant's claim as a surviving spouse. Put another way, even if the change of beneficiary form filed with Aetna was valid, it did not give priority to the beneficiary.

In light of our resolution of these issues, we need not determine whether the Decedent was competent when he executed the change of beneficiary form. We also decline to consider appellant's claim that the change of beneficiary form was invalid because it was incomplete.

### III.

If a surviving spouse takes priority over a beneficiary under the Plan, the question arises as to whether the Separation Agreement vitiated appellant's statutory rights. According to appellant, her "status as spouse at the time of Mr. Young's death ... is the contingency that gives her the contractual right to receive the pension," and only by divorce could she "have ended the contingency." Appellant maintains that the County "Code does not authorize a way to deprive one's spouse at [the] time of the participant's death from receiving the pension death benefits. In the statutory design of the County Code, the status as 'spouse' can only be terminated by divorce or annulment...." Thus, under A.A.C.C. § 5–211(f), appellant maintains that the Separation Agreement is "irrelevant," and she is "entitled to the death benefits as a matter of law," given that she was not divorced from Mr. Young when he died.

We reject appellant's broad contention that a spouse cannot voluntarily waive his or her rights to pension benefits under the County Plan. In this regard, we note the absence in the statutory scheme of an express prohibition of a contractual waiver as to pension benefits. *Cf. Allfirst,* 140 Md.App. at 372, 780 A.2d 440 (noting that, if the Legislature wanted to prohibit certain conduct under a statute, "it would have said so.")

Congress enacted a comprehensive federal scheme for the protection of pension plan participants and their beneficiaries ("ERISA"). *See Stewart v. Thorpe Holding Company Profit Sharing Plan*, 207 F.3d 1143 (9th Cir.2000). ERISA requires all plans within its scope to include anti-assignment provisions. 29 U.S.C. § 1056(d)(1) provides: "Each pension plan shall provide the benefits provided under the plan may not be assigned or alienated." Under the Retirement Equity Act of 1984, 26 U.S.C. § 417, the only exception to the anti-assignment provision of 29 U.S.C. § 1056(d)(1) is a state qualified domestic relations order that meets the requirements of 29 U.S.C. § 1056(d)(3)(A). *Stewart*, 207 F.3d at 1148–49. ERISA also places considerable limitations upon a plan administrator with respect to what documents can be considered in making pension determinations. The parties acknowledge, however, that the County's Plan is exempt from ERISA. Therefore, appellant's reliance on *Metropolitan Life Insurance Company v. Pettit*, 164 F.3d 857 (4th Cir.1998), is misplaced. In that case, the court determined that a marital separation agreement could not alter the beneficiary designation under a pension plan, because it was "an outside agreement." Nevertheless, the rationale of the case turned on the fact that the plan was subject to ERISA; this Plan is not.

*Estate of Thomas Angelo Altobelli v. International Business Machines Corp.*, 77 F.3d 78 (4th Cir.1996), is instructive. There, a married employee of IBM participated in the company's pension and life insurance plan. According to the terms of the pension plan, if the participant failed to designate a beneficiary, the beneficiary of the life insurance plan became a "default beneficiary" of the pension plan. Some time later, the employee and his wife divorced and disposed of their property according to the terms of a settlement agreement that provided:

"'All of the following property is hereafter the sole and exclusive property of the Husband, and the wife hereby waives and transfers to the Husband any interest that she may have in the property:

* * *

(g) Husband's IBM pension and other deferred compensation plans, if any.' "

*Id.* at 79 (citation omitted).

Nonetheless, the ex-wife was a "default beneficiary," according to the terms of the employee's plan, as the husband failed to designate a new beneficiary. Thus, upon the death of the employee, IBM sought to distribute the proceeds of the pension plan to the former wife, claiming that it "must administer the pension plans only according to their terms, without regard to the separation agreement." *Id.* The Fourth Circuit determined that the ex-wife had waived all rights to the plan, and therefore the benefits were payable to the husband's estate.

The court considered whether a deceased employee's beneficiary could alienate his or her rights to the benefits of an ERISA governed pension plan, pursuant to a settlement agreement. Although ERISA contemplates an "anti-alienation" clause, requiring that "each pension plan shall provide that benefits under the plan may not be assigned or alienated," 29 U.S.C. § 1056(d)(1)(1988), the court determined that the clause "did not apply to a beneficiary's waiver." *Id.* at 81. Rather, the provision applied to the participant of the plan, not the participant's beneficiary. *Id.* Moreover, the court determined that giving effect to a waiver embodied in a domestic relations order "did not burden plan administrators" so as to violate ERISA. *Id.* The court concluded:

> In this case, each party clearly intended to relinquish all interests in the pension plans of the other. Congress's provision for QDROs reveals that, in some situations, it deems the intent of the parties sufficiently important to override the policy of simplified administration. Because enforcement of a divorce agreement's specific waiver of ERISA pension-plan benefits would require no marginal infringement of that policy beyond the infringement already necessitated by the QDRO provision, and since ERISA does not directly address the issue, we join the Seventh Circuit in

holding as a matter of federal common law that such a waiver is to be given full effect.

*Id.*

It follows that if the Separation Agreement is valid and enforceable, and, further, that the waiver language is legally sufficient, appellant could be bound by it. We proceed next to the question of whether the Separation Agreement is valid and enforceable.

## IV.

Even if a spouse can voluntarily elect to waive benefits, appellant claims that the text of the waiver is insufficient to effect a relinquishment of her rights to the pension benefits. Appellant suggests that a sentence by sentence analysis of the waiver language reveals the deficiencies, because the waiver language is too "general in nature," and "does not comply with the minimum requirements" of *PaineWebber Inc. v. East,* 363 Md. 408, 768 A.2d 1029 (2001). Appellant states:

[B]esides identifying the specific account, the waiver language must specifically mention the survivorship interest or future expectancy under that account. This is where the Young waiver language of paragraph 13 is insufficient. It does not identify the survivorship interest of Gail Young that she would have upon the death of her husband. This is the contingent, future expectancy.... The language in paragraph 13 totally fails to identify the survivorship interest of Gail Young. Nor does it specifically identify that she has a future expectancy interest that exists under death benefit section as spouse or joint annuitant. Consequently, when this language of waiver under paragraph 13 is examined in detail, it is revealed to be general in nature.

Ms. Young continues:

In the instant case, the language of waiver is even less detailed. It merely states in paragraph 13 that she "waives any interest of any nature thereunder in that account." This is almost identical to the general type of waiver included in PaineWebber. Consequently, the language in-

cluded in paragraph 13 of the Young Separation Agreement must be deemed general in nature and not specific enough to be the type of waiver that would be effective under the rules of PaineWebber.

The last sentence of paragraph 13 grants to the husband the right to name a "beneficiary" to the death benefits associated with the Plan. Even if Mr. Young changed his "beneficiary," it did not change the status of Gail Young as his "spouse." The Changes of Beneficiary form still identified him as "married." As discussed supra, § 5–210 called for both the naming of a spouse and the designation of a beneficiary who would receive benefits under certain contingent conditions set out under § 5–211. Paragraph 13's sentence reasonably means that Mr. Young could name any beneficiary to the death benefit that would receive those benefits in the event that Gail Young's payments ceased, if the other statutory requirements were satisfied.

In its Memorandum Opinion and Order, the court found that the language of the waiver paragraph "specifically identified the future expectancy with the specified certificate number . . . ," and thus amounted to a waiver of rights. We agree.

At the outset, we pause to review the principles of contract construction applicable to the Separation Agreement. The construction of a written contract is a question of law, subject to *de novo* review by an appellate court. *Langston v. Langston*, 366 Md. 490, 505–06, 784 A.2d 1086 (2001); *Auction & Estate Representatives, Inc. v. Ashton*, 354 Md. 333, 341, 731 A.2d 441 (1999); *JBG/Twinbrook Metro Ltd. v. Wheeler*, 346 Md. 601, 625, 697 A.2d 898 (1997). As a fundamental principle of contract construction, we seek to ascertain and effectuate the intention of the contracting parties. *Society of Am. Foresters v. Renewable Natural Resources Found.*, 114 Md.App. 224, 234, 689 A.2d 662 (1997); *Hartford Accident & Indem. Co. v. Scarlett Harbor Assocs. Ltd. P'ship*, 109 Md. App. 217, 290–91, 674 A.2d 106 (1996), *aff'd*, 346 Md. 122, 695 A.2d 153 (1997). Moreover, "the primary source for determining the intention of the parties is the language of the contract

itself." *Hartford Accident & Indem.*, 109 Md.App. at 291, 674 A.2d 106.

Contracts are interpreted "as a whole to determine the parties' intentions." *Sullins v. Allstate Ins. Co.*, 340 Md. 503, 508, 667 A.2d 617 (1995). Ordinarily, the terms of a contract are construed consistent with their usual meaning, unless it is apparent that the parties ascribed a special or technical meaning to them. *See Fister v. Allstate Life Ins. Co.*, 366 Md. 201, 210, 783 A.2d 194 (2001); *Cheney v. Bell Nat'l Life Ins. Co.*, 315 Md. 761, 766, 556 A.2d 1135 (1989).

In ascertaining the parties' intent, Maryland follows the objective law of contract interpretation. *See Taylor v. NationsBank, N.A.*, 365 Md. 166, 178, 776 A.2d 645 (2001); *B & P Enterprises v. Overland Equip. Co.*, 133 Md.App. 583, 604, 758 A.2d 1026 (2000). Thus, the court is required to "give effect to [the contract's] plain meaning," without regard to what the parties to the contract thought it meant or intended it to mean. *Wells v. Chevy Chase Bank*, 363 Md. 232, 251, 768 A.2d 620 (2001); *see PaineWebber Inc.*, 363 Md. at 414, 768 A.2d 1029; *Ashton*, 354 Md. at 340–41, 731 A.2d 441; *Calomiris v. Woods*, 353 Md. 425, 436, 727 A.2d 358 (1999). Generally, " 'it must be presumed that the parties meant what they expressed.' " *PaineWebber Inc.*, 363 Md. at 414, 768 A.2d 1029 (citation omitted); *see Jones v. Hubbard*, 356 Md. 513, 534, 740 A.2d 1004 (1999). Therefore, the " 'true test of what is meant is ... what a reasonable person in the position of the parties would have thought' the contract meant." *Society of Am. Foresters*, 114 Md.App. at 234, 689 A.2d 662 (citation omitted). " 'If only one reasonable meaning can be ascribed to the [contract] when viewed in context, that meaning necessarily reflects the parties' intent.' " *Labor Ready v. Abis*, 137 Md.App. 116, 128, 767 A.2d 936 (2001) (citation omitted). In addition, "the parties to an agreement are deemed to have contracted with knowledge of existing law...." *Heyda v. Heyda*, 94 Md.App. 91, 98, 615 A.2d 1218 (1992).

When a contract is clear and unambiguous, " 'its construction is for the court to determine.' " *Wells*, 363 Md. at

251, 768 A.2d 620 (citation omitted). Whether a contract is ambiguous is a question of law, which is subject to *de novo* review by an appellate court. *Calomiris,* 353 Md. at 434, 727 A.2d 358. Contractual language is considered ambiguous when the words in it are susceptible of more than one meaning to a reasonably prudent person. *Ashton,* 354 Md. at 340, 731 A.2d 441; *Calomiris,* 353 Md. at 436, 727 A.2d 358; *Davis v. Magee,* 140 Md.App. 635, 650, 782 A.2d 351 (2001). A contract is not ambiguous, however, merely because the parties to it do not agree as to its meaning. *Fultz v. Shaffer,* 111 Md.App. 278, 298, 681 A.2d 568 (1996).

To determine if contractual language is susceptible of more than one meaning, a court reviews the contract itself. *University of Baltimore v. Iz,* 123 Md.App. 135, 162, 716 A.2d 1107, *cert. denied,* 351 Md. 663, 719 A.2d 1262 (1998). It must also consider "the character of the contract, its purpose, and the facts and circumstances of the parties at the time of the execution." *Pacific Indem. Co. v. Interstate Fire & Cas. Co.,* 302 Md. 383, 388, 488 A.2d 486 (1985). But, it is not the province of the court to rewrite an agreement to rectify an ambiguity, to avoid hardship to a party, or because one party has become dissatisfied with its terms. *Bailer v. Erie Ins. Exchange,* 344 Md. 515, 539, 687 A.2d 1375 (1997); *Canaras v. Lift Truck Services, Inc.,* 272 Md. 337, 350, 322 A.2d 866 (1974); *Fultz,* 111 Md.App. at 298, 681 A.2d 568.

When the trial court finds a contract ambiguous, the trial court may receive parol evidence to clarify its meaning. *Bushey v. Northern Assurance,* 362 Md. 626, 632, 766 A.2d 598 (2001); *Sullins,* 340 Md. at 508, 667 A.2d 617. If the appellate court agrees with the trial court's finding of ambiguity, "it will apply a clearly erroneous standard to the trial court's assessment of the construction of the contract in light of the parol evidence received." *Calomiris,* 353 Md. at 435, 727 A.2d 358.

*PaineWebber,* 363 Md. at 408, 768 A.2d 1029, is pertinent. There, the Court addressed whether a provision in a divorce settlement was enforceable as a waiver of a former wife's

interest in the proceeds of her ex-husband's Individual Retirement Account ("IRA"). Under the terms of the IRA, the husband initially designated his wife as the beneficiary. Four years later, the parties executed a separation agreement, and they divorced the following year. The husband subsequently remarried and died three years later. At the time of death, the ex-wife remained the named beneficiary of the account. As a result, the ex-wife sued PaineWebber, seeking to recover the proceeds of the account, to which the decedent's estate also claimed entitlement. PaineWebber, joined by the husband's estate and widow, argued that the separation agreement included a "pension waiver" that foreclosed the ex-wife's claim to the retirement funds.

The provision of the settlement agreement, entitled "Pension Waiver," stated, in relevant part:

Each of the parties hereby expressly waives any legal right either may have under any Federal or State law as a spouse to participate as a payee or beneficiary regarding any interests the other may have in any pension plan, profit-sharing plan, or any other form of retirement or deferred income plan including, but not limited to, the right either spouse may have to receive any benefit, in the form of a lump-sum death benefit, joint or survivor annuity, or pre-retirement survivor annuity pursuant to any State or Federal law, and each of the parties hereby expressly consents to any election made by the other, now or at any time hereafter, with respect to the recipient and the form of payment of any benefit upon retirement or death under any such pension plan, profit-sharing plan, or other form of retirement or deferred income plan.

*Id.* at 415, 768 A.2d 1029.

Based on the waiver language, the trial court granted summary judgment to the estate, widow, and PaineWebber. We reversed. *East v. PaineWebber Inc.*, 131 Md.App. 302, 748 A.2d 1082 (2000). Regarding the issue of whether the ex-wife waived her right as a beneficiary to the IRA, we concluded that the language was insufficient to effect a waiver,

because it did not specifically identify the "future expectancy." We said, at 131 Md.App. at 315–16, 748 A.2d 1082:

> [W]e believe that the Agreement's general waiver language is insufficient to terminate [the ex-wife's] rights as beneficiary to the East IRA. Not only did it fail specifically to mention the East IRA, it wholly failed to mention the waiver of any survivorship interest or future expectancy. Without more, we do not believe that, by executing the Agreement with general waiver language, [the ex-wife] waived her rights as a beneficiary to the East IRA. In order to do so, we believe it necessary that the language of the separation agreement clearly provide for waiver of future expectancy interests.

The Court of Appeals agreed that the language in the pension waiver provision did "not support a finding that [the ex-wife] waived her rights as beneficiary to the East IRA." *PaineWebber Inc. v. East*, 363 Md. at 416, 768 A.2d 1029. The Court reasoned, at 363 Md. at 415–16, 768 A.2d 1029:

> It has not been determined . . . who the named beneficiary is. If no change of beneficiary was effected by [the husband], then [the ex-wife's] consent to a change is simply irrelevant. The Estate's consent argument improperly assumes that the named beneficiary of the East IRA was validly and effectively changed. If the beneficiary has been effectively changed, it is pursuant to a power reserved in [the husband] to which [the ex-wife's] consent was not required . . . .
>
> Furthermore, [the ex-wife] does not claim the East IRA based on status or relationship as a spouse; she claims under a contract right, as the named beneficiary. Thus, the language waiving "any legal right . . . as a spouse to participate as a payee or beneficiary . . . in any . . . retirement or deferred income plan" does not defeat [the ex-wife's] claim. We agree with the conclusion of the Court of Special Appeals that "the 'Pension Waiver' provision of the Agreement does not support a finding that Carol waived her rights as a beneficiary to the East IRA."

Our decision in *Heineman v. Bright,* 140 Md.App. 658, 782 A.2d 365 (2001), is also instructive. There, the widow of a deceased company employee filed a complaint seeking to declare her rights to the company's Defined Benefit Plan and Trust ("Trust"). The husband's estate and ex-wife argued that the ex-wife waived her rights to the Trust in a prenuptial agreement. The relevant portion of the agreement stated:

> The parties hereby expressly waive any legal right either may have under any Federal or state law as a spouse to participate as a payee or beneficiary under any interest the other may have in any pension plan, profit sharing plan, or any other form of retirement or deferred income plan, including, but not limited to, the right either spouse may have to receive any benefit in the form of a lump sum death benefit, joint or survivor annuity or pre-retirement survivor annuity pursuant to any state or Federal Law.

*Id.* at 662, 782 A.2d 365.

Additionally, the parties disclosed the corresponding property interests in a "Schedule" attached to the prenuptial agreement. The husband specifically listed "Defined Benefit IRA" as an asset, which incorporated the Trust in issue. Relying on *PaineWebber,* the ex-wife asserted that the prenuptial agreement did not foreclose her rights to the Trust. We noted that the ex-wife failed to address the issue in the court below, but indicated that, even if she had, we would have determined that she waived any claim to the Trust in her prenuptial agreement. Unlike in *PaineWebber,* we noted that the prenuptial agreement specifically listed the property in question. Moreover, the ex-wife waived any "rights as a spouse" to the Trust. Consequently, we concluded that she was not entitled to any benefits under the pension plan.

Based on the foregoing authorities, and assuming the Agreement is valid and enforceable, we are unpersuaded by appellant's argument that the waiver language in the Agreement is too general to accomplish a waiver of benefits. Paragraph 13 specifically refers to the Decedent's ownership of the annuity, "available to him through his former employer, Anne

Arundel County, Maryland." Moreover, it expressly indicates that the "annuity is handled by Aetna Life Insurance Company under Certificate # 164340273." It also provides that the wife is familiar with the benefits associated with this account, and "waives any interest of any nature" in the account. Similarly, ¶ 13a identifies appellant's interest in two retirement plans, which were rolled over into an IRA account and a separate "Vested Life Annuity" account with Blue Cross of Maryland. Mr. Young "waive[d] any interest of any nature thereunder in those accounts or any successor accounts thereto." Accordingly, we conclude that the waiver language is sufficient to accomplish a waiver.

## V.

Appellant claims the court erred in granting summary judgment to the County with respect to her various challenges to the validity of the Agreement. She claims the Separation Agreement is void and unenforceable because she was "under duress" and "was coerced at the time she signed the Separation Agreement," and had a "diminished capacity." To that end, she contends that she signed the Agreement because the Griers threatened that she would not see her husband again unless she did so. Further, she asserts that the circuit court erred in granting the County's summary judgment motion because it precluded her "from developing these arguments through discovery and presentation of facts supporting these claims." The County maintains that appellant could not challenge the Agreement based on the Decedent's incapacity. As best we can determine, it did not address the duress claim below.

As we indicated, notwithstanding the claims of duress, coercion, and incapacity, the Board presumed the validity of the Agreement and change of beneficiary form. It also said that, in the absence of a valid Agreement and change of beneficiary form, appellant would be entitled to recover the pension benefits. In effect, then, the presumed validity of the Agreement was a critical component of the Board's decision; if the

Agreement were found to be invalid due to duress, coercion, or incapacity, appellant might then be entitled to recover.

No discovery was ever conducted on the issue of duress. Nor is it clear whether full discovery was conducted· as to the Decedent's capacity, although appellant asserted that "factual disputes" existed in regard to execution of the Agreement. The circuit court ruled that because appellant "gained the benefits" under the Agreement, and waited too long to complain, she could not "avoid the [A]greement" on that ground. The court also upheld the waiver language in the Agreement as legally sufficient, without specifically addressing the issue of duress or the standard for summary judgment.

Appellant complains that the trial court "erroneously applied the standard of review as if this was solely an appeal from the Board of Appeals." She asserts, among other things, that the court "failed to ... determine whether there were disputes of fact that required a trial." In regard to the claims raised in the declaratory judgment action concerning the validity of the Agreement, appellant maintains that issues of duress, mental capacity, and consideration involve disputed questions of fact, yet she had "no opportunity to conduct discover[y] on these issues." Appellee has not addressed these contentions in its brief.

At this juncture, we pause to observe that summary judgment is permissible in a declaratory action. *Megonnell v. United States Auto. Ass'n,* 368 Md. 633, 642, 796 A.2d 758 (2002). But, it is " ' "the exception rather than the rule." ' " *McBriety v. Commissioners of Cambridge,* 127 Md.App. 59, 65, 732 A.2d 296 (1999) (citation omitted).

Maryland Rule 2–501 establishes a two-part test for summary judgment. In deciding a motion for summary judgment, the trial court must decide whether there are any genuine disputes of material fact and, if not, whether either party is entitled to judgment as a matter of law. *Jones v. Mid–Atlantic Funding Co.,* 362 Md. 661, 675–76, 766 A.2d 617 (2001); *Okwa v. Harper,* 360 Md. 161, 178, 757 A.2d 118 (2000); *Beatty v. Trailmaster Products, Inc.,* 330 Md. 726,

737–38, 625 A.2d 1005 (1993); *Philadelphia Indemn. Ins. Co. v. Maryland Yacht Club, Inc.,* 129 Md.App. 455, 465, 742 A.2d 79 (1999).

We review, *de novo,* an order granting summary judgment. *Tyma v. Montgomery County,* 369 Md. 497, 801 A.2d 148 (2002); *Green v. H & R Block, Inc.,* 355 Md. 488, 502, 735 A.2d 1039 (1999). Our task is to determine if the trial court reached the correct legal result. *Murphy v. Merzbacher,* 346 Md. 525, 530–31, 697 A.2d 861 (1997); *Goodwich v. Sinai Hosp. of Baltimore, Inc.,* 343 Md. 185, 204, 680 A.2d 1067 (1996). This requires us to undertake the same analysis as the trial court; we evaluate the identical material from the record, and decide the same legal issues presented to the circuit court. *Lopata v. Miller,* 122 Md.App. 76, 83, 712 A.2d 24, *cert. denied,* 351 Md. 286, 718 A.2d 234 (1998).

To defeat a claim for summary judgment, the party opposing the motion must produce evidence demonstrating a genuine dispute of material fact. *Scroggins v. Dahne,* 335 Md. 688, 691, 645 A.2d 1160 (1994); *Berringer v. Steele,* 133 Md.App. 442, 470, 758 A.2d 574 (2000). A material fact is one that will alter the outcome of the case, depending upon how the factfinder resolves the dispute. *King v. Bankerd,* 303 Md. 98, 111, 492 A.2d 608 (1985); *Faith v. Keefer,* 127 Md.App. 706, 734, 736 A.2d 422, *cert. denied,* 357 Md. 191, 742 A.2d 521 (1999). Mere general allegations or conclusory assertions of a disputed fact will not suffice. *Beatty,* 330 Md. at 738, 625 A.2d 1005. Rather, the party who opposes summary judgment must present the court with facts "in detail and with precision." *Id.*

In considering a summary judgment motion, the trial court must resolve all factual disputes, including reasonable inferences drawn from the facts, in favor of the non-moving party. *Frederick Rd. Ltd. P'ship v. Brown & Sturm,* 360 Md. 76, 94, 756 A.2d 963 (2000); *Dobbins v. Washington Suburban Sanitary Comm'n,* 338 Md. 341, 345, 658 A.2d 675 (1995); *Electronics Store, Inc. v. Cellco P'ship,* 127 Md.App. 385, 395, 732 A.2d 980, *cert. denied,* 356 Md. 495, 740 A.2d 613 (1999). Furthermore, the trial court may not determine the credibility

of witnesses. *Impala Platinum, Ltd. v. Impala Sales (U.S.A.), Inc.,* 283 Md. 296, 329, 389 A.2d 887 (1978); *Thacker v. City of Hyattsville,* 135 Md.App. 268, 286, 762 A.2d 172 (2000). When, as here, both sides file cross-motions for summary judgment, it does not necessarily follow that the court must grant summary judgment. *See Regal Savings Bank v. Sachs,* 352 Md. 356, 372, 722 A.2d 377 (1999). Undisputed facts may give rise to conflicting inferences that are not appropriate for resolution by summary judgment. *Id.* Summary judgment is not a substitute for trial. *Mayor and City Council of Baltimore v. Ross,* 365 Md. 351, 359, 779 A.2d 380 (2001).

Even if the facts are undisputed, the appellate court must still determine whether the trial court accurately interpreted the applicable law and correctly applied it to the undisputed facts. *Fister v. Allstate Life Ins. Co.,* 366 Md. at 210, 783 A.2d 194. Ordinarily, we will uphold the grant of summary judgment "only on the grounds relied upon by the trial court." *Blades v. Woods,* 338 Md. 475, 478, 659 A.2d 872 (1995); *see Gross v. Sussex,* 332 Md. 247, 254 n. 3, 630 A.2d 1156 (1993); *Hoffman v. United Iron and Metal Co.,* 108 Md.App. 117, 132–33, 671 A.2d 55 (1996).

Ms. Young is correct that in its opinion the circuit court discussed the standard of review as to administrative agencies, but did not mention the summary judgment standard. Nor did the court state that there were no disputes of material fact. We are satisfied, however, that the court was well aware that it had before it cross-motions for summary judgment in both cases. In its ruling, the court stated: "[T]his case reaches the Court on Cross Motions for Summary Judgment." Similarly, in its Order, the court denied appellant's summary judgment motion and granted the cross-motion of appellee. The failure to mention the summary judgment standard in the opinion certainly does not establish that the court did not know the proper standard. *Cf. Uninsured Employers' Fund v. Pennel,* 133 Md.App. 279, 754 A.2d 1120 (2000) (noting that circuit court articulated an improper standard of review of

decision of Workers' Compensation Commission, but concluding that court actually applied the correct principles to the undisputed facts).

Nevertheless, we agree with appellant that the court erred in granting summary judgment as to the claims of duress and capacity. We explain.

As the Court said in *Gordon v. Gordon*, 342 Md. 294, 300, 675 A.2d 540 (1996), "[t]he prevailing view is now that 'separation agreements ... are generally favored by the courts as a peaceful means of terminating marital strife and discord so long as they are not contrary to public policy.'" *Id.* at 300–301, 675 A.2d 540 (citation omitted). Because a separation agreement is a contract, the general principles of contract analysis apply. *See Langston,* 366 Md. at 505–506, 784 A.2d 1086; *Moore,* 144 Md.App. 288, 306–08, 797 A.2d 839; *see also Calabi v. Government Employees Ins. Co.,* 353 Md. 649, 653, 728 A.2d 206 (1999) (recognizing that a settlement agreement is a type of contract).

Mutual assent is an essential element with respect to the formation of a valid contract. *Creel v. Lilly,* 354 Md. 77, 101, 729 A.2d 385 (1999); *Safeway Stores Inc. v. Altman,* 296 Md. 486, 489, 463 A.2d 829 (1983); *Mitchell v. AARP,* 140 Md.App. 102, 117, 779 A.2d 1061 (2001). As with other contracts, a separation agreement is voidable, and subject to recision, if it can be shown that it was unconscionable or procured through fraud, duress, or undue influence. *Hale v. Hale,* 74 Md.App. 555, 572, 539 A.2d 247 (1988); *Hale,* 66 Md.App. at 233, 503 A.2d 271; *Blum v. Blum,* 59 Md.App. 584, 594, 477 A.2d 289 (1984); *Saggese v. Saggese,* 15 Md.App. 378, 388, 290 A.2d 794 (1972). When a party's agreement to contract is "forced or involuntary, he will not be bound by that commitment." *Blum,* 59 Md.App. at 594, 477 A.2d 289. As we observed, a declaratory judgment action is a proper vehicle to determine the validity of a contract, including a marital separation agreement. *See Hale,* 66 Md.App. at 233–34, 503 A.2d 271; *see Fader,* § 13–3(d)(3), at 560.

What the *Blum* Court said as to duress and undue influence is pertinent here.

> Duress, fraud or undue influence may be the basis to avoid a property settlement. To establish duress there must be a wrongful act which strips the individual of the ability to utilize his free will.

> \* \* \*

> A condition precedent to the right to rescind requires that the party against whom relief is sought be restored substantially to the position which he held before the termination was completed. Put another way, a party may not affirm the favorable part and avoid the unfavorable part.

*Blum,* 59 Md.App. at 594, 477 A.2d 289 (internal citations omitted).

The *Blum* Court also elucidated the meaning of duress in the context of voidable contracts, stating:

> Duress which permits avoidance of a contract consists of the use of coercion, the victim's loss of the ability to act independently and the entry by the victim into the contract. The burden of proving each and every one of these elements remains with the person seeking to set aside the contract. When a confidential relationship has been shown to exist, however, the burden is upon the dominant party to establish that the agreement was fair in all respects. There is no presumption that the husband is the dominant partner in the marriage. Since that presumption does not apply, whether there is a confidential relationship becomes a question of fact.

> It has been said that absent proof of a confidential relationship, agreements not disclosing any injustice on their face[,] are presumptively valid. This proposition has been generally accepted and applied. The obverse, namely that agreements disclosing injustice on their face are presumptively invalid, has had very limited application to property settlements. The added factor of a confidential relationship has not altered the results.

*Blum,* 59 Md.App. at 595, 477 A.2d 289 (internal citations omitted); *see also Baran v. Jaskulski,* 114 Md.App. 322, 333, 689 A.2d 1283 (1997) (persons who, with counsel, enter contracts as to marital property are generally "left in the condition in which they placed themselves," absent undue influence.); *Holmes v. Coverall North America, Inc.,* 98 Md.App. 519, 529, 633 A.2d 932 (1993) (" 'Grounds in equity or law for revocation of a contract include an allegation that the contract is void for lack of mutual consent, consideration or capacity or voidable for fraud, duress, lack of capacity, mistake, or violation of a public purpose.' ") (Citation omitted); *Eckstein v. Eckstein,* 38 Md.App. 506, 511, 379 A.2d 757 (1978).

The Restatement (Second) of Contracts § 175 (1981), also provides guidance as to the concept of duress. It states:

**§ 175 When Duress by Threat Makes a Contract Voidable**

(1) If a party's manifestation of assent is induced by an improper threat by the other party that leaves the victim no reasonable alternative, the contract is voidable by the victim.

(2) If a party's manifestation of assent is induced by one who is not a party to the transaction, the contract is voidable by the victim unless the other party to the transaction in good faith and without reason to know of the duress either gives value or relies materially on the transaction.

 Nevertheless, a contract procured through undue influence or that results from duress is not automatically void; instead, it is merely voidable. Therefore, it may also be ratified. The *Blum* Court explained, 59 Md.App. at 594–95, 477 A.2d 289:

A contract which may be avoided on the basis of duress may be ratified after the duress has been removed. The injured party must act to repudiate the agreement promptly or within a reasonable time after the removal of the duress, otherwise he may be deemed to have ratified the contract because of his silence and failure to act. *See Saggese v. Saggese, supra,* 15 Md.App. at 388, 290 A.2d 794 and cases

there cited. "The injured party may ratify the contract after the duress has been removed not only by his silence but also in various other ways, as, for example, by continuing to act in accordance with the contract, or by continuing to accept or claim benefits flowing from it." 17 C.J.S. *Contracts* § 169 (1963).

Of significance here, the Court in *Blum* set forth the process that a court should follow to resolve the kind of challenge to a separation agreement that appellant presented. It explained:

> What the chancellor should have done was to look at the consideration and determine if the terms were so unfair and inequitable as to require that the agreement be set aside. If they were not, and he held they were not, he should then have considered whether there was a confidential relationship; then he should have considered whether there was duress. If he found there was duress, he should next have considered (1) whether the conditions precedent to setting aside the agreement had been met, including whether the victim had retained the benefits; (2) whether the contract was thereafter ratified; and (3) whether laches applied. Then and only then should be have decided whether to set aside the agreement. . . .

*Id.* at 602, 477 A.2d 289.

In addition to the claim of duress, appellant challenged Young's mental capacity at the time he executed the Separation Agreement and change of beneficiary form. Appellee asserts in its brief that "appellant cannot impeach the separation agreement" on the ground of the Decedent's capacity, because a contract entered into by a mentally deficient person is voidable only at the election of the mentally deficient person.

Contrary to the circuit court's conclusion, our review of the record does not reveal any "benefits" gained by appellant with respect to the Agreement. As we indicated earlier, we may only uphold the circuit court's award of summary judgment

for the reasons stated by the court, unless the matter is one for which we would have no discretion.

Certainly, the Decedent was quite ill when he executed the Agreement and change of beneficiary form. Construing the facts in the light most favorable to appellant, as the court was required to do, the Decedent may well have lacked the mental capacity to contract at the time he signed those documents. Moreover, although the Agreement provides that the Decedent and appellant mutually renounced any claim to the other's retirement funds, the record does not reflect the value of appellant's funds. If the Decedent relinquished a claim to a fund of appellant's that had little value, this could certainly affect a view of whether appellant received any "benefits" under the Agreement.

More important, considering that Young was so ill when the Agreement was signed, it would have been reasonable for appellant to assume that Mr. Young would predecease her. With the reality of the Decedent's health in mind, it is hard to envision how it was in appellant's interest to execute the Agreement, so as to support the court's finding that she gained "benefits" in doing so. Pursuant to the Agreement, the Decedent gave up his rights to appellant's retirement funds, just as she gave up her rights to his. But, the likelihood was that Young was never going to live long enough to collect appellant's retirement funds. Conversely, appellant's funds were not seriously at risk of recovery by Young whether or not she executed the Agreement, because Young probably was not going to live long enough to inherit them. Absent the Agreement, appellant, as the Decedent's surviving spouse, would have received the Decedent's pension benefits if he predeceased her. Therefore, it appears that appellant gave up valuable rights without gaining anything in return.

The court below did not otherwise address the claim of duress or the issue of whether appellant could challenge the Agreement based on her husband's incapacity. Nor did it adhere to the roadmap articulated in *Blum*. In addition to the points set out above, we observe that these issues are intense-

ly factual, and the parties had not yet conducted full discovery. Because we believe appellant was entitled to pursue these claims, the court acted prematurely in granting summary judgment as to them.

 **JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY VACATED. CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID ONE HALF BY APPELLANT AND ONE HALF BY APPELLEE.**